FRED ZINKULA et al., Appellants, v. KATHERINE ZINKULA et al., Appellees.

**WILLS: Undue Influence—Testator's State of Mind—Declarations.**
1  Under a charge that a will was the result of undue influence, the declarations of the testator made to a disinherited heir prior to the making of the will are admissible as bearing on his (testator's) state of mind.

PRINCIPLE APPLIED: A letter written by testator to a daughter was held admissible, wherein testator referred to his wife (who was charged with having exercised the undue influence) as "that wicked mamma of ours."

**WILLS: Undue Influence—Declarations of One Employing Undue**
2  **Influence—Evidence.** Declarations hostile to a disinherited heir, made either before or after the execution of a will, by one charged with having employed undue influence on testator, are admissible to show the state of mind of the declarant.

PRINCIPLE APPLIED: Declarations of testator's wife (a) that the daughters of testator did not deserve any of the property, (b) that the daughters should not get any of the property, and (c) that she, the mother, would not allow testator to give the daughters anything, were held admissible.

**APPEAL AND ERROR: Excluded Evidence Otherwise Admitted.**
3  It is futile to attempt to predicate error on the exclusion of evidence otherwise received.

**APPEAL AND ERROR:** Excluding Questions After Witness Has Exhausted His Knowledge—Evidence. It is futile to attempt to predicate error on the exclusion of questions after the witness has shown by his answers that he has no further knowledge on the subject.

**WILLS:** Inequality of Distribution—Effect. Inequality of distribution will not, of itself, defeat a will—is not, of itself, any evidence of undue influence.

**WILLS:** Undue Influence—Declarations of Testator Not Substantive Evidence. He who would overturn a will on the ground of undue influence must not rest on the declarations of the testator alone.

**WILLS:** Inequality of Distribution—Effect.
5, 7.

**WILLS:** Undue Influence—Opportunity to Employ—Effect. Disposition or state of mind to employ undue influence, plus an *opportunity* to employ such influence on testator is not of itself sufficient to prove the ultimate fact of undue influence.

**WILLS:** Mental Incompetency—Delusions—Will Must Be Offspring of. Merely showing that testator was possessed of a delusion raises no question for a jury. It must fairly appear that the will was the offspring of the delusion.

PRINCIPLE APPLIED: If testator was possessed of a delusion, it was that his wife was sullen, morose, and lacking in affection for both him and the daughters, and especially that the wife was bitterly hostile to the daughters and opposed to testator's giving any of his property to them. *But he had no sympathy with such believed attitude of the wife,* and he and the daughters were, up to the time of his death, on friendly and affectionate terms. His will discriminated against the daughters. *Held,* such delusion furnished no support for overturning the will.

*Appeal from Johnson District Court.*—Hon. R. P. Howell, Judge.

Tuesday, September 21, 1915.

Action to set aside the probate of a will. Trial to a jury. At the conclusion of plaintiffs' testimony, a verdict was directed for defendants. Plaintiffs appeal.—*Affirmed.*

*Wade, Dutcher & Davis,* for appellants.

*Ney & Bradley,* for appellees.

GAYNOR, J.—On the 7th day of March, 1912, Frederick Zinkula executed the following will:

"First. I direct that all my lawful debts and claims including funeral expense, expenses of last sickness and the expenses of administration be first paid out of my estate.

"Second. I give, devise and bequeath to my son, Joseph Zinkula, the following described real estate situated in Johnson county, Iowa, to wit: The N. ½ of the S. W. ¼ and the E. ½ of the S. W. ¼ of Sec. 29, Twp. 78 N., R. 5 W. of the 5th P. M., containing 100 acres, on condition that my said son, Joseph Zinkula, pay to my wife, Katherine Zinkula, the sum of $120.00, annually, each and every year, during her life.

"Third. I give, devise and bequeath to my beloved wife, Katherine Zinkula, during her life the following described real estate in Johnson county, Iowa, to wit: The N. E. ¼ of the N. E. ¼ of Sec. 31 and the N. W. ¼ of the N. W. ¼ of Sec. 32; also the W. ½ of the S. W. ¼ of the S. W. ¼ of Sec. 29, all in Twp. 78 N., of R. 5 W. of the 5th P. M., containing 100 acres, to be by her used during her life, and after her death the same land described in item third of this will to be and become the property of my son, George Zinkula, absolutely.

"Fourth. I direct and it is my will that the following described forty acres, to wit: The S. E. ¼ of the S. W. ¼ of Sec. 29, Twp. 78 N., R. 5 W. of the 5th P. M., be sold by my executor hereinafter named for the best price obtainable, and the proceeds thereof be equally divided among my six daughters, to wit: Magdalina Simpson, Katherine Schintler, Anna West, Barbara Anderlik, Mary Hotz, Rose Zinkula, share and share alike.

"Fifth. I give, devise and bequeath to my son, Frank Zinkula, the following described real estate situated in Johnson county, Iowa, to wit: The N. ½ of the S. W. ¼ of Section 9, Twp. 78 N., R. 5 W. of the 5th P. M. on condition

that my said son, Frank Zinkula, pay to my wife Katherine Zinkula, the sum of $120.00 annually, each and every year during her life.

"Sixth. To my son, Frederick Zinkula, who left me when I needed him most on the farm, I hereby give and bequeath the sum of $5.00, and no more, out of my estate.

"Seventh. I give, devise and bequeath to my daughter, Rose Zinkula, the following described real property situated in Iowa City, Iowa, to wit: The E. ½ of Lot Six and the W. ½ of Lot Seven in Block 16, Iowa City, Iowa, except 25 feet off of the east side of said W. ½ of Lot Seven in said Block 16, subject, however to a life estate therein of my wife, Katherine Zinkula, who is to use and occupy the same during her life.

"Eighth. I give, devise and bequeath to my beloved wife, Katherine Zinkula, all the rest and remainder of my estate, she to have all the moneys and evidences of money, in lieu of dower in addition to the provisions otherwise herein made for her, she to have the remainder herein mentioned and the use thereof for and during her life, same to be used and disposed of according to her pleasure, and if any of said personal property remain undisposed of by my said wife at the time of her death, I give, devise and bequeath all such residue and remainder to my six daughters mentioned in item four herein, same to be divided among them in equal shares, share and share alike.

"Ninth. I hereby nominate and appoint John Tellin, of Iowa City, Iowa, executor of this my last will and testament, and direct that he be not required to give any bond as such executor."

The testator died on the ninth day of May, 1913, and this will was duly admitted to probate thereafter. At the time of his death, he was 73 years old. His wife was 64 years old. He left surviving him his wife, five sons and six daughters, and two grandsons, the offspring of a deceased daughter.

This action is brought to set aside the order of probate on the alleged grounds: (1) That the said Frederick Zinkula, at the time of the execution of the will, was of unsound mind, and did not possess testamentary capacity; (2) that the execution thereof was procured by undue influence exerted upon him by the defendants, and the same was not his free and voluntary act and deed, and therefore does not constitute and is not his last will and testament.

The defendants appeared and denied the allegations upon which plaintiffs base their right to have the will set aside. The cause was tried to a jury. At the conclusion of contestants' testimony, the court, on the motion of proponents, directed a verdict against the contestants. Hereafter, for convenience, we shall refer to the contestants as plaintiffs and proponents as defendants.

Plaintiffs appeal and urge two grounds for reversal:

First. That the court erred in its ruling upon the admission of testimony in certain particulars, to which attention will be hereinafter called.

Second. The court erred in sustaining a motion to direct a verdict for the defendants under the record as made.

I. We will take up the grounds for reversal in the order assigned: Did the court err in the rejection of testimony as charged by the plaintiffs? To intelligently consider these complaints, it will be necessary to review somewhat the condition of the record at the time this evidence was rejected by the court. It may be well, however, to have the matter complained of in mind while the record is being reviewed.

The first error relied upon is that the court erred in rejecting a certain letter offered in evidence, written by the testator to his daughter, Magdalina, dated March 18, 1909. This letter is shown to be in the handwriting of the testator, and received by the daughter in due course of mail, and reads as follows:

1. WILLS: undue influence: testator's state of mind: declarations.

"Well, I thought to write you a few lines, to let you know how we are getting along. We are all well with that bad weather. Every day we have different weather. One day it is nice, next day it rains, and the third day it is frosty, so it is queer weather this year.

"I was at our children on the farm last week. I was there three days, I visited them all there, and they are all well. I must also let you know that our Annie is going to the farm, they are going to move next Monday. They sold their house and rented a farm about 3 miles west of town, so they are going to farm. I don't know how they will get along, everything that they must buy is so dear, and they have to buy everything, so I wonder how they will get along.

"David Simpson was here last week. I was coming from town and met him on the street. I came near not recognizing him, he stopped and offered me his hand, and I could not recognize him, he looks sort of sickly. So I told him to go with me to dinner, but he did not want to go with me; he was afraid of that wicked mamma of ours. He went with the other man to Schintler's and I went there too, then I don't know when they went home, I didn't see them any more.

"So when you write, let me know when Rosie wrote you, and if you are all well, write also if you have that cistern finished, if not, then have it made, and I will pay for it what it will cost."

The second error assigned is predicated on the ruling of the court in rejecting the testimony of Katherine Schintler, a daughter of the testator. She was asked by plaintiffs' counsel this question: "Q. Did you have any talk with your mother as to what your father had to do about his property?"—the plaintiffs stating at the time that this offer was to show feeling between the mother and the girls who are con-

2. WILLS: undue influence: declarations of one employing undue influence: evidence.

testants.    Objection  was  interposed  to  the  question  and
sustained.

The  third  error  in the  admission  of  testimony  is  predi-
cated  upon  the  action  of  the  court  in  sustaining  an  objection
to  the  following  question  propounded  to  Mary  Hotz,  daughter
of  the  testator,  while  testifying  for  the  plaintiffs:  ''Q.   Were
there  any  times  when  you  heard  your  mother  say  what  your
father  should  do  with  his  property  in  reference  to  the  girls;
whether  they  should  get  it  or  should  not  get  it?''   This  is
asked  for  the  purpose  of  showing  the  feeling  that  existed
between  the  mother  and  the  girls.

The  fourth  error  assigned  on  this  point  is  that  the  court
erred  in  striking  out  the  testimony  given  by  Michael  Zinkula,
a  son  of  the  testator,  in  which  he  said:  ''I  heard  mother  speak
about  her  feeling  towards  the  girls.   She  told  me  one  time  she
did  not  want  father  to  give  any  more  property  to  the  girls.
I  asked  her  why.   She  said  she  wouldn't  let  him.''

It  appears  that this  testimony  as  to  what  was  said  by
the  mother  related  to  a  time  after  the  execution  of  the  will,
and  was  stricken  out  for  that  reason.   These  are  all  the  errors
assigned  upon  the  first  ground  for  reversal.

As  to  the  first  error  complained of,  involving  the  action  of
the  court  in  rejecting  a  letter  written  by  the  testator  to  his
daughter,  Magdalina,  the  18th  day  of  March,  1909,  we  have
to  say  that,  in  view  of  the  theory  upon  which  this  case  was
tried,  we  think  this  letter  might  well  have  been  admitted  by
the  court.   Plaintiffs  seek  to  maintain  two  positions:  (1)  That
the  father  was  very  friendly  towards  the  daughters;  wished
them  well,  and  had  a  kindly  interest  in  their  welfare;  (2)
that  the  mother  was  hostile  to  the  daughters  and  had  no  kindly
interest  in  their  financial  condition,—that  she  did  not  wish  the
girls  to  have  any  of  the  father's  property.   But,  we  cannot
reverse  the  case  upon  this  ground;  for,  although  this  letter
has  some  bearing  upon  the  issue  made,  it  touches  so  slightly
upon  the  point  contended  for  that  its  exclusion  cannot  be
deemed  prejudicial  in  view  of  the  fact  that  the  court  allowed

to go into the record thirteen other letters written by the testator to this same daughter, covering a period from 1893 up to and including the period covered by this letter, in which stronger language was used of and concerning the mother than was used in this letter.

As to the second error assigned, we think, too, that the court erred at the time in not permitting an answer.

3. APPEAL AND
ERROR: excluded evidence otherwise admitted.

It appears, however, from the record that, subsequently, when another daughter, Anna West, was being examined by the plaintiffs, this same question was propounded, and thereupon the plaintiffs made the following offer:

"Plaintiffs offer to prove by this witness that her mother told her before this will was made that she was afraid that Mr. Zinkula would give the home residence to Rosy and said if he ever did, she would pull every hair out of her head and that she wanted him to sell the place and go and buy a small place because she did not want her to get that place, and this evidence is offered for the purpose of showing the feeling that the mother, whom we charge with exercising undue influence, had toward this daughter Rosy. Plaintiffs also want to show by this witness that at different times her mother said, told her, said in her presence, that the girls should not get anything, that the boys should get the property, for the same purpose to show the feeling she had towards the plaintiffs."

By Counsel: "I also want to recall Mrs. Schintler on the same subject and offer to prove by her that her mother said father wanted to give Rosy the house and wanted to know what Mrs. Schintler thought about it, and Mrs. Schintler said let him do as he wanted to and her mother said she would see to it she wouldn't get it, that the boys would get the farms and the girls need not look for anything, they wouldn't get anything."

Thereupon Mrs. West gave the following testimony:

"Mother used to tell me that if father would will the house to Rosy she said she would pull her hair out of her head. She wanted the house for George and she always told me she says us girls wasn't going to get anything, it was all for the boys. I asked her why. She said, you didn't work. She says, you don't deserve it. She used to tell me she wanted father to sell the house. I asked her why. She says, I am afraid he is going to give it to Rosy. She wants him to take a smaller place for some reason. I don't know why. She always said she wanted him to sell the place, she wanted to buy a small house. She wouldn't do it because he always had it ready for Rose."

At the conclusion of Mrs. West's testimony, the plaintiffs recalled Mrs. Schintler, and she was permitted to testify and did testify substantially as suggested by counsel at the time he expressed his desire to recall her, as hereinbefore set out, covering the same subject-matter called for by the question to which objection was sustained, and of which complaint was made. The ruling excluding this testimony originally was without prejudice to the plaintiff.

The third error relied upon relates to the refusal of the court to permit the witness Mary Hotz to answer a certain question as to what she heard her mother say her father should do with his property in reference to the girls. No error can be predicated upon the action of the court in refusing an answer to this question, because the witness had already testified as follows:

4. APPEAL AND ERROR: excluding questions after witness has exhausted his knowledge: evidence.

"I heard mother talk to father only one time in regard to what should be done with the property. We come to the city, I and my husband, and mamma was complaining about the girls not coming home to visit her and papa says, mamma gave everything to the boys and they don't come to see her either, and mamma says that the girls didn't work, they didn't deserve it, that is why they didn't get it or wouldn't. She thought the boys would get it. The reason she gave father for

that was that the girls didn't use to work as hard as the boys.''

This testimony went in without objection. Thereupon, counsel propounded the question to which objection was urged and sustained, and of which complaint is made. There is nothing in the record to indicate that, if she had been permitted to answer this question, the answer would have been other or different than was detailed by her in her previous testimony, hereinbefore set out. There is nothing to show that she ever had any other conversation with her mother, except the one which she detailed. We cannot speculate on the record for the purpose of finding error. The question assumes that there were other times when she heard her mother say something about the property, but there is no evidence that she did, in fact, hear her mother speak concerning the property, except as hereinbefore detailed. There is no prejudicial error apparent on this point, and none can be presumed from this state of the record.

We come now to the fourth error assigned, the striking out of the testimony of Michael Zinkula, which is as follows:

''She (meaning the mother) told me one time, she says to me, she didn't want father to give any more property to the girls. I asked her why, she said because she wouldn't let him do that.''

Counsel for the plaintiff, referring to the ruling on the question submitted to Michael Zinkula above, thereupon proposed to the court to show by the witness that his mother told him many times that she didn't want her husband to will the girls a cent, and that he went and left them forty acres of land anyway, but he didn't dare to give them a cent if he was living, counsel stating, at the time, that the evidence was offered for the purpose of showing the extent of the feeling that the mother had against the girls. The court thereupon

said, "This was after his death?" to which counsel responded, "Yes," and the offered testimony was not received.

In considering the relevancy of this testimony, its probative force and importance in the disposition of the controversy, we must bear in mind that it was the claim and contention of the plaintiffs, all the way through, that the mother was hostile to these girls; that she didn't want her husband to leave them any of his property; that she was a dominating, domineering woman; that the husband was afraid of her, and afraid to oppose her wishes in this respect. It is contended that this dislike for the daughters and this purpose to prevent the father from bequeathing them anything continued up to the time of her husband's death; that this indicated a motive on her part to exercise the undue influence charged. It is claimed that the will is the result of the undue influence exercised by this mother over the testator during his lifetime, and it is claimed that it is always competent to show the condition of the mind and the malice, if any, of the party charged with the exercise of undue influence. Of course, this does not necessarily show the exercise of undue influence, but it is a fact to be considered with other evidence in determining whether undue influence was used or not. The fact, however, that the person charged with exercising undue influence had a hostile mind towards those excluded from the testator's bounty, and desired that they should be excluded, even though such state of mind and desire were communicated to the testator, does not, in and of itself, show the exercise of undue influence in the doing of the thing charged to have been the result of such exercise.

In discussing this question, counsel for the plaintiffs rely somewhat upon what is said by this court in the eighth paragraph of the opinion in *Betts v. Betts,* 113 Iowa 111, 118. We do not think, however, that the discussion there is sufficiently broad and comprehensive to throw much light upon the question now under consideration. We are inclined to think that this evidence was competent and material. Whether its exclu-

sion is ground for reversal, under the record, presents a different question. The fact that an error is committed by the court in receiving or rejecting evidence does not always call for a reversal. If, with this evidence before the court, the result must have been the same, it would be idle to reverse on account of its exclusion. We will speak of this later.

This brings us to a consideration of the real controversy in this case, the second ground upon which reversal is sought.

II. The contention of the plaintiffs is that the court erred in directing a verdict for two reasons: (1) That it was clearly shown that the testator was of unsound mind; that he was possessed of an insane delusion with reference to the disposition of his property, and the attitude of his wife with reference to such disposition. (2) That it was clearly proven that the testator was under the complete domination of his wife, who was determined in her attitude of ill feeling towards her daughters, and determined in her position that they never should receive any of the property.

It goes without saying that it is not necessary that the record establish clearly and without question the propositions upon which plaintiffs seek to have the probate of this will set aside. It is sufficient if the evidence is such that minds honestly searching for the truth as to the question in controversy might differ in their conclusion as to what the ultimate fact is. The general rule so often pronounced by this court is, where there is evidence in the record tending to support a proposition, and reasonable minds might differ as to whether the evidence does or does not support the proposition, then it is a question for the jury; that is, the question must be left to the jury for its determination, whenever the evidence is of such a character that reasonable minds might differ as to the conclusion to be reached, from the evidence, as to what ultimate fact is established. The trier of the fact is entitled to draw all legitimate inferences from the facts proven. Many ultimate facts are established by inference alone. Many facts of which we take cognizance are deductions or inferences from

known or proven facts. A third fact may be born of and have its being, with a recognized entity in the world of thought, from other facts, which common experience shows have creative force in its production.

To entitle plaintiffs to recover in this suit, they must establish by a preponderance of the evidence that the instrument in question does not express the mind of the testator. To this end, one of two facts must affirmatively appear: either that the testator, at the time of the making of the will, was mentally incompetent to make a will, or that his mind was so unduly influenced by his wife in the making of it that it did not express his will and purpose, but rather the will and purpose of his wife. There is absolutely no evidence in this record even hinting at a possibility that any undue influence was exercised by anyone other than the wife, the mother of these girls.

We start with the fundamental proposition that every man has a right to dispose of his property as he sees fit. His children have no legal claim upon his bounty. He alone has

5, 7. WILLS:
inequality of
distribution:
effect.

the right to estimate the comparative deserts of his children and their claims, if any, upon his bounty. The law provides, in the absence of any will, that the children shall share equally in the distribution of the estate. This places, however, no handicap upon the will of the testator in the disposition of his property. The fact that the will is inequitable, because to some children, who apparently are just as deserving as others, he gives less than a just proportion of the estate, is a fact to be considered in determining whether or not the will expresses the intent of the testator. This is due to a recognized fact that parents do not usually unjustly discriminate between their children, when in possession of all their faculties, and when not unduly influenced. However this may be, inequality of distribution will not defeat the purpose of the will. Indeed, if it did, very few wills would be permitted to stand. If the testator desired a just and equitable distribution of his property pro rata among

his children, there would be no occasion for making a will. The law would do that for him. It is only when the testator desires that his property should go other than is directed by the law,—that some of his children should receive less and some should receive more of his estate,—that a will is resorted to.

In the case before us, it would seem as if these daughters should have had more consideration at the hands of the father in the disposition of his property, but it does not justify us in thwarting his purpose as expressed in his will. There is no substantive evidence in this case that the testator, at the time of the making of the will, was not in full possession of all his faculties. There is no evidence that he did not understand and comprehend the import of his will and the disposition he was making of his property. There is no evidence that he did not understand and comprehend the extent of his property and who were the natural subjects of his bounty. There is no evidence that he did not have a mind capable of exercising judgment and deliberation, and capable of weighing the consequences of his will to a reasonable degree, and the effect of it upon his estate and his family. There is no evidence that he was either physically or intellectually weak. There is no evidence of any overt act on the part of his wife, tending in any way to influence him in the disposition of his property. There is no substantive evidence of anything said or done by her even tending to show that she sought in any way to influence him in the disposition of his property by will or otherwise. There is no substantive testimony that he and his wife did not live together fairly amicably, and that they did not entertain for each other the kindly feeling which usually exists between husband and wife. It is true that, in the letters which he wrote to his daughters, he complained of his wife's treatment. It is true he spoke of her as being hostile to the daughters. It is true that he wrote to his daughters as late as January, 1912:

6. WILLS: undue influence: declarations of testator not substantive evidence.

"Mamma continues to be peevish and morose most of the time. She doesn't speak and continues to be angry. I don't know what is the matter with her. When she speaks to me, it is always in anger. That seems to be her way. I believe she thinks I am sending to you some money, or to Magdaline. She doesn't want to give anything to the girls, but when George spent several hundred dollars last spring, she said nothing."

It is true that he wrote several letters to his daughters of the same import. However, every substantial fact stated by him in his letters to his daughters touching the attitude of the wife towards him, her disposition and character, her attitude towards her daughters, and her disposition towards giving property to them, was denied by the wife. There is no substantive evidence that any fact detailed in these letters, concerning the wife and her disposition towards the daughters, was true. The wife testified, "I never said to him that I didn't want him to give anything to the girls." The wife positively testified, and there is no substantive evidence to dispute her, that she was always on good terms with her daughters; had nothing against them. In fact, she denies every matter written by the husband to these daughters, touching her attitude towards her husband and towards her daughters. While it is true that these letters written by the testator to his daughters were competent evidence as throwing light upon the condition of his mind, yet it is not substantive evidence, and cannot be considered as tending to show that undue influence was in fact exerted upon him in the making of the will. See *In re Townsend Estate*, 128 Iowa 621, in which the following excerpt from Schouler on Wills is quoted with approval:

"A testator's declarations, whether made before or after the execution of the will, . . . are admissible chiefly to show his mental condition or the real state of his affections; and they are received rather as his own external manifesta-

tions than as evidence of the truth or untruth of the facts
relative to the exertion of undue influence upon him.  They
may corroborate, but the issue calls for its own proof from
the living. . . . There, on the whole, should be inde-
pendent testimony indicating undue influence before the de-
cedent's declarations are considered, and then they are chiefly
pertinent to show the condition of the mind susceptible to
the sinister influence and a testamentary act correspond-
ingly.''

It is, however, stated in that case that mere declarations
are of very little force, and amount to very little in them-
selves, in the face of a prima-facie showing that the testator
was a thoroughly competent person, enjoying normal health,
and under no apparent coercion or stress when he executed the
instrument.  See, also, *Johnson v. Johnson*, 134 Iowa 33, in
which it is said:

''Undoubtedly the statement of the deceased (and these
letters are nothing but statements of the deceased) may be
received as indicating his state of affections or dislike for par-
ticular persons benefited or not benefited by the will, of his
inclination to obey or resist persons alleged to have exerted
the influence, and, in general, his mental or emotional condi-
tion, with reference to his being affected or influenced by any
of the persons concerned.  But as an account or recital of
what, in fact, has occurred in the past, such evidence is no
more than hearsay, and ought not to be received as tending to
establish the facts related.''

It is undoubtedly the law that, where there is evidence
independent of the inequitable features of the will tending
to show undue influence exerted upon the testator, or that the
testator's mind was enfeebled by age or sick-
ness, or was for any reason unsound, an un-
just discrimination between those who have
equally meritorious claims upon his bounty may be considered

5, 7. WILLS:
inequality of
distribution:
effect.

for the purpose of corroboration, or for the purpose of showing that he was, in fact, in a mental condition to be influenced, leading to the probability that he was affected by such influence exerted upon him. But unquestionably, under all the authorities, there must be some evidence of undue influence, some evidence of mental incapacity, outside of the mere fact of inequitable distribution. The mere fact of apparent unjust discrimination in the will is not, in and of itself, substantive evidence that he was unduly influenced in the making of the will, or that he was wanting in testamentary capacity. See *Johnson v. Johnson, supra; In re Townsend Estate, supra; Vannest v. Murphy,* 135 Iowa 123; *Slaughter v. McManigal,* 138 Iowa 643.

Mere proof that someone who is beneficially affected by the will had an opportunity to influence the testator in his favor, or proof that one beneficially affected not only had an opportunity but a disposition to avail himself of opportunities presented, without proof of something done or attempted by him in the way of influencing the testator, would not be sufficient proof of undue influence exercised. Nor would proof of the fact that one who is shown to be hostile to those who did not get recognition in the will had an opportunity to exercise hostile influence on the mind of the testator be sufficient without further proof.

8. WILLS: undue influence: opportunity to employ: effect.

The most that can be contended for in this record, so far as undue influence is concerned, is that the mother of these girls who are complaining desired that they should not have any portion of the father's estate; that she had an opportunity of influencing the father to that end. There is no evidence that she ever said or did anything tending to effectuate that purpose, except, perhaps, the testimony of Mary Hotz, hereinbefore set out, in which she said she heard mother talk to father only one time in regard to what should be done with the property:

"I and my husband came to the city and mamma was complaining about the girls not coming home to visit her, and papa says, mamma gave everything to the boys, and they don't come to see her either, and mamma says that the girls didn't work, they didn't deserve it, that is why they didn't get it or wouldn't get it. She thought the boys would get it. The reason she gave father for that was that the girls didn't use to work as hard as the boys."

It does not appear, however, when this conversation was had, or what led up to the conversation. It does not appear that the husband made any response, or even that he heard what was said by the wife. It appears that a discussion was had between the witness Mary Hotz, her father and mother. The mother was complaining about the girls not coming home, and the father remarked, "The boys don't come either, and yet you want them to have everything," and the mother responded that the girls didn't work and didn't deserve anything, and gave that as a reason why they shouldn't receive anything. It was a mere expression of the opinion of the wife that the girls were not entitled to receive as much as the boys because they didn't work as hard, presumedly, for the father, as the boys did. This is the only time the record discloses that the father and mother talked on this matter, and the father entertained his opinion apparently without fear of offending his wife.

Under this record, there is no substantive evidence of any want of testamentary capacity on the part of the father— no evidence that he was physically or mentally weak. So far as this record discloses, he was a man of considerable business ability, entertained a proper regard for his relationship to his family; his love for the girls was uninfluenced by anything that the mother said or did. He visited them, invited them to his home, treating them with all the consideration and fondness of a parent for a child. There is no substantive evidence of any ill feeling or disturbance in the home life. This wife

and mother was called to the stand by the plaintiffs. She was examined touching her home life, and her relationship to her husband, and denied that she entertained a feeling of hostility towards her daughters; denied that she communicated any such feeling to her husband; and practically said there was no more trouble between her and her husband and in her family than is found in the ordinary home.

These contesting daughters were on the stand, and nowhere do they impeach the mother's character, or attempt to show any dominating influence by her over the life of her husband. Nor do any of them attempt to show that the husband was in the least under the control or domination of his wife. No act is shown in which he surrendered his will to hers, or where she ever coerced him into doing anything against his will or his judgment. There is no evidence that she was peevish or morose,—no evidence that the daily intercourse between herself and her husband was not such as usually and ordinarily exists between husband and wife. Of course, we speak now of evidence independent of what was written by him in the letters. This we do not accept as substantive evidence of these facts in this controversy.

But it is argued that, conceding that the mother loved her daughters, conceding that she did not entertain a hostile feeling towards them, conceding that she was a dutiful and affectionate wife in all her relationships with her husband, conceding that she was not morose and sullen, conceding that all that the letters contained touching the wife and her attitude towards these contestants and the husband is untrue, then it follows that the testator must have been laboring under some delusion touching these matters, and that this is evidence of insanity; that this is evidence of an insane delusion which rendered him incapable of making a will.

9. WILLS : mental incompetency : delusions : will must be offspring of.

Not all insane delusions render one incapable of making a will. A man may possess all the mental qualities essential to the transaction of even intricate business, and yet have delu-

sions about other matters that do not affect or concern the act which he is required to perform. It is true that, in some instances, delusions have been held sufficient to justify a court in holding that they had controlling force and dominated the action of a testator in making a will. Where it is shown that the delusion is unfounded, and without it, in all probability, a different course of conduct would have been pursued, or where it is shown that the act of the testator was influenced by the delusion, and that, without such influence operating on his mind, he would have done other than he did, then his act is said to be the result of the delusion and not a deliberate act of a mind possessing testamentary capacity. Those are cases where it is shown that one has omitted from his will a child who in the ordinary course of nature, was dear to him and to whom his natural instincts would have directed the bestowal of his bounty, and it was made to appear that his mind had been falsely poisoned against the child. *Hardenburgh v. Hardenburgh,* 133 Iowa 1, 6, illustrates these holdings. See, also, *Friedersdorf v. Lacy,* 90 N. E. (Ind.) 766, 768; *Barbo v. Rider,* 67 Wis. 598, 602 (31 N. W. 155); *Boughton v. Knight,* 3 L. R. (P. & D.) 64, 75; *Snell v. Weldon,* 90 N. E. (Ill.) 1061; *Rivard v. Rivard,* 66 N. W. (Mich.) 681, 688.

The case at bar presents a very different question. Nothing was ever said or done, so far as this record discloses, to poison the mind of the testator against these daughters. Indeed, he seems to have had a great affection for them up to the time of his death. In no way did his belief in his wife's attitude affect his intercourse with them. He entertained no delusion as to his daughters—as to their character, as to their attitude towards him, or as to their right to be the recipients of his bounty. The most that can be claimed is that he had a delusion as to the attitude of his wife towards them, an attitude with which he appears to have had no sympathy. His social intercourse with them during all his life was pleasant. He invited them to his home. He visited at their homes. He seemed interested in their welfare, and in the will he made

more bountiful provision for them than for some of the sons who, so far as this record shows, were equally entitled to be recipients of his bounty as were the sons of his choice.

It would require a very strange and unnatural process of reasoning to reach the conclusion that the father was influenced by his belief in the attitude of the mother towards these daughters in the making of the will in question, and clearly so in the absence of any showing that she asserted or attempted to assert any control over him in the disposition of the property. We think the record wholly fails to establish either of the propositions upon which the plaintiffs rely.

As to the exclusion of the testimony of Michael Zinkula, heretofore referred to, we have to say that this testimony went only to the mental attitude of the wife. It never appears to have been communicated to the husband; and, as there was no substantive evidence tending to establish the fact of undue influence, the error in striking out this testimony was without prejudice, for the reason that, even with it in, the court must have directed a verdict for the defendants.

The case is therefore—*Affirmed.*

DEEMER, C. J., LADD and SALINGER, JJ., concur.