## IN RE WILL OF NORAH BOYLE.

**WILLS:** Validity—Undue Influence — Presumption — Relationship— Burden of Proof. Affectionate relationship existing between mother and daughter, and the fact that they have lived together most of their lives, will not cast upon the child, as a beneficiary in the mother's will, the burden of proof of showing that the will was without undue influence.

*Appeal from Greene District Court.*—E. G. ALBERT, Judge.

MAY 19, 1919.

ACTION involving the contest of a will, on the ground that the testatrix was not of testamentary capacity, and that the will was procured by undue influence. Verdict and judgment for the proponent. Contestant appeals.—*Affirmed.*

*E. G. Graham* and *Frank X. McCaffry,* for appellant.

*S. J. Sayres* and *E. B. Wilson,* for appellees.

GAYNOR, J.—This action involves the probate of an instrument purporting to be the last will and testament of Norah Boyle. It was presented for probate by her daughter, Catherine Scruggs, who will be hereafter known as proponent. Michael Boyle, her son, alone contests the probate, and on the following grounds. The first and second grounds need not be considered, except as they bear upon the third:

(1). That the will was never published or witnessed as required by law.

(2) That Norah Boyle was not of sound and disposing mind at the time she made the will.

(3) That she was induced to execute the will by undue influence and fraud.

The cause was tried to a jury, and a verdict returned for the proponent. Upon this verdict, the will was admitted to probate, and the contestant, Michael Boyle, appeals.

At the time of the execution of this will, Norah was about 88 years of age, and a widow. She had three children: a daughter, Catherine Scruggs, the proponent, and two sons, John Boyle and the contestant, Michael Boyle. Catherine was the eldest, and about 52 years of age. Michael was a year and a half younger, and John about 43 years of age. The will was executed on the 14th day of July, 1916, and was read over aloud in the presence and hearing of Michael and his wife and Catherine, the proponent. On and prior to the 28th day of June, 1916, the testatrix was the owner of 440 acres of land, in her own right, situated in Greene County, Iowa, and on that day, she made a deed of it to her daughter, Catherine, conveying to her all of said land in her own right, and as trustee for the son John. In this deed, she reserved to herself for her life, the possession, rents, and profits. It contained, also, a provision that, upon her death, the daughter, Catherine, should, during the life of her brother John Boyle, manage and control the same as in her judgment she deemed best, and pay to him the net income thereof on the 1st day of March of each year. This deed was delivered to Catherine and accepted by her under the conditions and terms named in the deed.

Therefore, at the time the will was executed, the only property then owned by the testatrix consisted of certain certificates of deposit, amounting to about $9,000. These certificates she divided between Michael and Catherine, at the time the will was executed, giving to Michael certifi-

cates amounting to $2,010, and the balance to Catherine. These certificates were endorsed by her and delivered by her at the time to Michael and Catherine, and Michael then expressed himself as fully satisfied with what she had done. He received his certificates from her hand, took them to the bank, cashed them, and on the next day, nothing further needing his attention, departed for New York City. The testatrix died on the 8th day of August, 1916.

The question of the sufficiency of the evidence to sustain the verdict is not raised; yet, in view of the contentions made touching the instructions asked and given, we think it is proper to set out briefly the facts as they appear in the record.

As said before, Catherine was the eldest child and only daughter. She lived with her mother and father until his death in 1902, and continued to live with her mother thereafter until her marriage, in 1904. The father was killed in an accident. John continued to live with his mother on the farm until about the year 1911, at which time he gave up farming. His mother then rented her farm, and came to live with Catherine. John has done nothing since. After the father's death, in 1902, Catherine was appointed administratrix of her father's estate. He died without a will. The property was divided between his children and his wife, each receiving his or her statutory share. He left quite a large estate.

The record discloses, without any contradiction, that Catherine was very fond of her mother, and very faithful in the service she rendered her, and that, from the time she was 18 until she was married, covering a period of 23 years (for she was 41 years old when she married), she worked on the farm, planted and husked corn, loaded grain and hay, milked cows, and did everything else that was to be done on a farm, and received no wages for her service. John also remained at home and worked upon the farm and re-

ceived no wages for his work. The mother was very fond of these two children who remained at home with her, and who were faithful to her unto death. Michael, the contestant, first left home when he was 15 years of age, stayed about a year,—possibly two years; was in Wisconsin, and part of the time in Illinois, and then returned home. Before he was 21 years of age, he left home again, and went to Brooklyn, New York, and remained there for a year; returned to Jefferson, and stayed a year; went back east and got married; came back home with his wife, and lived for a year and a half with his father and mother, sister and brother; then returned to Brooklyn, and has lived there ever since. After his father's death, he visited his mother but once, and that was in about 1908. She was then sick and in a hospital, and he stayed but a short time. The evidence further discloses that, during his stay at home, he frequently beat and abused his father, and that this often occurred in the presence of his mother; that she was heard to remark often that she would never forget how Michael had abused his father. He never did any work on the farm after he was 21, nor did he do anything to assist his parents in building up their fortune.

Coming now more closely to the time when the will was executed, it appears that, at the time the mother left the farm and came to live with Catherine, she was getting old. Her eyesight was failing. She was, in a measure, unable to do the work that was necessary to keep up a home. After she came to Catherine, her eyesight grew worse. Catherine took her to a hospital, about the 10th of May, 1916, and had an operation performed on her eyes. She continued to grow worse, and, at the time of the execution of the will, was totally blind, partially deaf, and bedridden, suffering from some stomach trouble. The jury could, however, have found from the testimony, and must have found, that, at the time she made the will, she had a full and in-

telligent knowledge of the act she was performing; a full knowledge of the property she possessed; an intelligent perception and understanding of the disposition she desired to make of it, and of the persons she desired should be the recipients of her bounty; and a capacity to recollect and comprehend the nature of the claims of those who were excluded from participating in her bounty. The jury could well have found from the evidence that she remembered, at the time, the fact that she had made the conveyance of her real estate on the 28th of June preceding, and that she knew that all the property left consisted of certificates of deposit; that she called for these certificates of deposit, and made disposition of them at the time or before the will was signed. It seems to have always been her preference to dispose of her property during her lifetime, rather than to make a will disposing of it after her death. It is apparent from the record that she knew death was slowly approaching. Her physical condition would suggest that. To persons in normal health, with the expectation of many years of life, the idea of making a will is often repugnant. Many people, at the time of making their wills, have been known to shed tears, feeling that, in making a testamentary disposition of their property, they emphasize the fact that they must die, and that their property must pass out of their hands into the hands of others. Some people would dispose of their property during their lifetime, so that they may see and enjoy the pleasure that comes to the recipients of their bounty, and so bind them in life to closer and more responsive love. This may account for previous dislike to make a will, and for the gifts *inter vivos*.

In our reading of this record, there is absolutely nothing to show that testatrix was influenced, in any way, by anyone, in making the disposition of her property. All that can be charged to proponent, this daughter, from which any influence operating on the mind of the testatrix could pro-

,ceed, is the fact that she was always a loving and kind daughter, and was faithful to her mother during all the years of her life, and exceedingly fond and thoughtful at the time when, in nature, the mother must have the care and sympathy of someone. Not one word is shown to have been spoken by her, nor one act disclosed as done by her, that would tend to influence the mother in the disposition of her property. Every act is the act of a kind and loving daughter to a stricken mother. When it became apparent that her mother was stricken, and had perhaps but a few months to live, Catherine wrote to Michael's wife, informing her of the fact, and impliedly inviting Michael and his wife to come to the mother's bedside. They came,—by what motive prompted, we leave the record to suggest. They arrived on the 3d of July. Thereafter, Michael and his wife both waited upon the old lady, gave her attention, sat up with her during the nights, were admitted freely to her presence; and the will was not made until the 14th of July. At the time it was made, they were present. They saw her when she executed the will. They talked with her before and after she executed the will. She called for the certificates of deposit which were the only property left to her, and made a distribution of them. Michael had read the deed to John about that time, and expressed himself satisfied with it. He expressed himself satisfied with the certificates which he had received. He took them and cashed them, and immediately left, feeling, no doubt, that his visit had been fairly profitable.

The most that can be found to justify the claim that this will was the result of undue influence is found in the fact that there existed between the testatrix and the proponent the closest blood relationship; that, as child and woman, she had been the companion of her mother, faithful, loving, and helpful; and that out of this grew a great love. All the influence she had or exercised over his mother was

that which always flows from a consciousness of love returned. In her sickness, the mother must, in nature, have remembered this faithful, kind, and loving daughter above all others. This is not the undue influence that the law contemplates. This is not the relationship that casts upon the beneficiary the burden of proof. In fact, it has been held by this court that the rule contended for by the contestant does not apply in cases of this kind, but only in dealings between people *inter vivos*. In *Graham v. Court-right,* 180 Iowa 394, this doctrine was announced in the following words: ·

"The doctrine that undue influence is to be presumed between parties *inter vivos,* dealing with each other when fiduciary relations exist between them, has no application to testamentary gifts. The theory as to contracts and gifts *inter vivos* is that a person having need of property, or at least a desire to retain it during life, is not likely to part with it without a measurably adequate equivalent. When it appears to have been given away or parted with for an inadequate consideration, to one in a dominating position in relation to the donor or grantor, the presumption arises that the latter has not freely parted therewith and its enjoyment, but that his act was induced by the undue exercise of the influence which the beneficiary may have had over him; and this presumption must be met by the grantee or donee and rebutted; else, in equity, it becomes as a fact proven —a vitiating factor in the transaction. But the primary presumption on which this whole doctrine rests is entirely lacking in testamentary disposition."

This doctrine was again recognized in *Pirkl v. Ellen-berger,* 179 Iowa 1122. In that case, it was said:

"The rule and its application to contracts *inter vivos* secures recognition through the fact that the living do not part with their property, even to their dearest friend, during their lifetime, without at least a fair consideration.

Where one sustaining fiduciary relations to another secures from the other a gift or donation, or a contract greatly to the disadvantage of the giver *inter vivos,* the law raises a presumption that the gift would not have been made, or the contract entered into, through the free and voluntary volition of the giver. This presumption calls upon the beneficiary to purge himself at least from a suspicion of improper influence in bringing about the gift. *  *  * In contemplation of death, however, the transaction wears a very different aspect. The property must be parted with, when that event arrives. It is most natural to select for benefaction those who are nearest and dearest, whether related by blood, business, friendship, or association. Men do not, in contemplation of death, ordinarily give their earthly possession over to their enemies, nor to those in whom they repose no trust and confidence. Indeed, the closer the relationship, the greater the bond that binds, the more certain is the mind that the testator chose intelligently the objects of his bounty. That he chose one who is dear to him, and excluded one who ought to be equally dear, does not cast upon the beneficiary the burden of showing that he did not procure the benefaction by the use of undue influence."

Of course, undue influence may be shown even under these circumstances, but the burden is on him who alleges it.

This brings us to a consideration of the only complaint made by appellant in this case, and that is, that the court placed the burden of proof on the contestant to establish undue influence. It is the thought of the appellant that the relationship existing between this mother and this daughter, the fact that they had lived together during most of their lives, the fact that the daughter was fond of the mother, and the mother reciprocated the fondness in all its fullness, ought to cast such a suspicion upon the transaction that the proponent ought to be put to the burden of purging

herself from the suspicion of undue influence, before she could call upon the defendant to prove actual undue influence. Defendant asked this instruction, and complained because it was not given:

"It appears, from the undisputed testimony in this cause, that the decedent, Norah Boyle, for several years prior to her death and at the time of her death, lived at the home of her daughter, Catherine Scruggs; and in connection therewith, if you shall find that a relation of confidence and trust was reposed in said Catherine Scruggs by the said Norah Boyle, then you are instructed that the burden of proof, as defined in these instructions, is upon the proponent, Catherine Scruggs, to show that the said Norah Boyle, in making of said proposed will, acted by her own free will, and that she, Catherine Scruggs, or anyone acting in her behalf, was free from any acts of influence or control over the said Norah Boyle, in the making of said proposed will and in the disposition of her property."

The court, however, instructed that the burden of proof rested upon the contestant. The court evidently found, as a matter of law, that there was no sufficient showing to charge a burden upon the plaintiff to purge herself of a suspicion of undue influence. We think the court was right in its instructions. The record did not justify the giving of the instructions asked.

This being the only error complained of, a reversal cannot be predicated upon it. The cause is, therefore,—*Affirmed.*

LADD, C. J., WEAVER and STEVENS, JJ., concur.