### In re Estate of Henry Bresler.

Elmer E. Bresler, Appellee, v. Florence Pershel et al., Appellants.

WILLS: Testamentary Capacity—Evidence. Evidence reviewed, and held insufficient to support a verdict of mental incompetency to execute a will.

Salinger, J., dissents.

*Appeal from Monona District Court.*—J. W. Anderson, Judge.

February 17, 1920.

CONTESTANTS filed objections to the probating of the will of Henry Bresler, deceased, claiming that he was not of sound mind, and that there was undue influence used by the widow and a son, who is the proponent. The case was tried to a jury, and, at the conclusion of the testimony of both proponent and contestants, proponent moved for a directed verdict in his favor, which was sustained. The contestants appeal.—*Affirmed.*

*Crary & Crary* and *Prichard & Prichard,* for appellants.

*Lutz & Lutz* and *Harding & Harding,* for appellee.

PRESTON, J.—The will was executed on May 4, 1918. Testator died on May 22, 1918, at the age of 72 years. His estate consisted of 160 acres of land in Monona County, personal property estimated at about $1,500, and some money in the bank; also 160 acres of land in Kansas, which was incumbered for $1,400. Appellants claim that there are inequalities in the will; but they concede that, under the authorities, even though it is unreasonable, that is not alone a ground for refusing probate. They say, however, that this is a circumstance to be considered, in connection with the other evidence bearing on the condition of testator's mind. The will gives the use of the Iowa land to his wife for life, and gives her, outright, all moneys and credits, and the household furniture. To his son Elmer E., the proponent, he gives the reversion in the home place; also, all stock, farm machinery, and other personal property, except the money, etc., given to his wife, provided that the son should pay all indebtedness against the property, except the indebtedness on the Kansas land. He directs that the executor sell the Kansas land, and pay the mortgage thereon, and divides the residue of such proceeds equally between his daughter, Florence Pershel, and his son Calvin Bresler. The two last named are the contestants.

The value of the Kansas land is not shown. It was attempted, on rebuttal, but, because it was not rebuttal, the court excluded it. Appellees contend that the alleged inequalities in the will are not as great as contended by appellants, for that the appellants receive their share out of the sale of the Kansas land, which is to be done soon, while proponent's enjoyment of his interest in the Iowa land is postponed until his mother's death. The daughter moved to Oklahoma some 18 years ago. She testifies that her brother Calvin, the contestant, was on good terms with her father most of the time. Neither of these children saw their father often. The son Elmer, proponent, saw his father almost daily, and the father seems to have been greatly interested in Elmer and his children. The provisions of the will in question are less favorable to Elmer than those of a prior will made by deceased which had been executed some time before, and was more favorable to the widow. The main point relied upon for reversal is that the evidence was such that the case should have gone to the jury on the question as to the mental condition of testator.

There are some circumstances shown in the record which frequently appear in elderly people who are seriously ill, and nearing the end. These, for the most part, have reference to the physical condition. These, of course, affect, to some extent, the mental. If it were the rule that, to make a valid will, a person's mentality should be 100 per cent, then but few wills could be sustained. Such is not the rule. We shall enumerate some of the more important circumstances shown by contestants, as tending to show incapacity, without going into details.

The testimony of the daughter and of some of the other relatives is much stronger than that of witnesses who are not related and not interested. Contestant Florence Pershel was not present at the time the will was executed. She was in Oklahoma that day. She had not seen her father for

six years, until April 12th, before he died. She saw him from that date on until April 26th, and, during that time, the doctors visited him four times. None of the doctors testified for contestants, and there is no evidence of medical witnesses in the record as to the nature and character of the physical condition of decedent, or the causes thereof, nor as to the effect thereof upon his mental condition. Mrs. Pershel further testified that, when she came to her father in April, after an absence of six years, she noticed quite a difference in her father. He was sick, in bad health, suffering, and weak, and she doesn't think his mind was good. He did not seem to care to talk. He did not know her boy. He would sit and stare; didn't pay attention to things around him; he looked out of the window one day, and asked who boys playing in the yard were. They were his grandsons. He would ask for his medicine, and afterwards declare he had not taken it, although sometimes he would get up and take it himself. He was an old soldier, and told war stories. He served all through the war, and received an injury to his arm. It was his habit for years to talk about things that transpired when he was fighting for his country, according to the daughter's testimony. In conversation, he repeated; talked more of things of the past. She came back on May 19th, which was after the execution of the will, and stayed until her father died. Deceased was suffering from his stomach and heart; used a cane or chair to walk across the floor. His weakness was increasing; his eyes were sunken; they were not bright as formerly. That was the last of April, before the will was executed. On cross-examination, she says she didn't know his condition on May 4, 1918, when the will was executed, and doesn't know the medicine he took. Deceased would sit on the porch, while she was there in April; seemed to enjoy it there; enjoyed being out. While she was there in April, she heard deceased talk with the son Elmer, about the farm

work; also heard Elmer's wife talking to deceased. She
says:

"I understood what he was saying. There was nothing
in the talk to Mrs. Elmer Bresler that indicated there was
anything wrong about my father's mind, and I think I
heard him talk to her possibly eight or ten times, or more,
during the thirteen days. Had there been anything unusual,
I would probably have remembered it, but I have no recol-
lection of him saying anything unusual to Elmer. * * *
Some days, father would be better, and some days, worse.
He was on friendly terms with Mr. Rohde [one of the sub-
scribing witnesses], and they would talk together. I never
heard anything unusual on the part of my father when he
talked to Mr. Rohde. My father would talk to him as
neighbors usually talk when they meet."

She again says, in this connection:

"Had father said anything unusual or out of the way,
I could have remembered it, but I remember nothing un-
usual. Q. You don't claim your father was out of his mind
during your thirteen days' visit, do you, but it was through
sickness and weakness, your father's mind was impaired?
A. I claim his mind was weak."

Upon these facts, she was permitted to give her opin-
ion as to the mental condition of her father, and that he
was not of sound mind. The wife of contestant Calvin
gave similar testimony, and states that these conditions
continued during the first week of May, 1918, but says she
never stayed all night at the Bresler home during the first
week of May, and is not positive whether she went there
once or twice with her husband during that week; not
sure whether she was there with her husband the first week
in May, or whether it was with Mr. Henry; was there two
hours on the 4th, a part of which time she talked with her
mother, in the house and yard. Doesn't remember the con-
versation of her father that day, except that he talked about

his strawberries; doesn't know what he did in the afternoon of that day, or what he talked about, or whether he was better or worse, that afternoon. Doesn't know what his condition was, at the time he made the will. She and her husband returned from Oklahoma in the spring of 1913, after several years' absence, and they did not visit her father for a year, although they lived within two miles of him. Visited him more after the fore part of 1916. A niece visited deceased on April 10th. He did not know her at first, but later said he knew her. They phoned for the doctor that day. At that time, his face was thin, and his eyes sunken. Another witness, a neighbor, testified that testator was poorly all winter; got weaker. Witness saw him in April, and he was weak and going down fast through April, until his death; noticed a difference in his conversation. His mind seemed to be considerably weakened; he seemed weaker in body and mind; his conversations were broken. Two or three other witnesses gave similar testimony, though some of it is not as strong as that we have set out, and nearly all qualified their evidence on cross-examination. One witness, who saw him on the morning of the 4th, says he does not know what the mental condition of deceased was, after he left him on the morning of the 4th, says he might have brightened up to such an extent, later that day, that he might be capable to transact business in the afternoon. Another of contestants' witnesses says, on cross-examination, that he visited deceased, May 11th; that deceased was in bed that day; that he saw him a week before the will was drawn. This witness says further:

"I noticed he grew perceptibly weaker, after he had taken to his bed, than when he was sitting on the couch. Up to the time he had taken to his bed, which seems to have been later than the time the will was made, he recognized me, of course, and I talked to him, and he would answer me intelligently. I could not give you the dates. Q. And

during all the times you talked to the old gentleman, when
he was lying on the couch and before he had taken to his
bed in sickness the last time, he was able to answer you
intelligently, and ask questions intelligently? A. Yes, sir,
fairly well, I think. He was an industrious, energetic busi-
ness man. Q. Now, in all your acquaintance with him, in
the winter before he had taken to his bed, and before the
will was drawn, when you would ask him questions, he
would answer them intelligently, as far as you recall? A.
Yes, sir, I think so. Q. Of course, you do not recall any an-
swer that he made that was unintelligent about business
matters, that you know of,—that is true, isn't it? A. I don't
recollect of anything in particular now. After the will was
executed, and after he had taken to his bed, if shaken up out
of the comatose condition, and he roused himself out of it,
I do not recall any statements he then made that were
illogical or unusual. When he woke up out of a comatose
condition, he always seemed to recognize me, and that con-
tinued down to the very last of his life."

The foregoing is a fair statement of the general char-
acter of contestants' evidence. The banker who drew the
will in question was a witness for proponent. He had
known deceased for several years. Deceased himself dictat-
ed the will, a few days before it was signed, which was on
the evening of May 4th. Deceased told witness about the
prior will, and what changes to make. When witness was
sent for, on the 4th, he took the will to the home of deceased,
and read it carefully to him, a paragraph at a time, and
deceased said it was all right. Witness destroyed the prior
will at the direction of testator. No one was present at
this time, except the widow and witness. Others had step-
ped out. Witness saw Rohde and Llise sign the will as
witnesses. Deceased visited with him and the two witnesses
to the will, three quarters of an hour. He says that de-
ceased complained about his limbs' being swollen; that,

during the time they were visiting, as ordinary persons, there was nothing to indicate any lapse of memory; he did not repeat himself; there was nothing unusual in his looks, except natural failing health; he was a very sick man. Mr. Rohde, whose farm adjoins that of deceased, had known deceased for 30 years. He was with deceased, the night the will was signed, an hour or more; saw nothing unusual in his condition, although deceased was weak; saw nothing wrong with his mental condition, speech, or look. He testifies that deceased was of sound mind; that deceased had been sick about a month or six weeks before the will was signed. The other subscribing witness gave similar testimony. Another neighbor, who lived half a mile from deceased, saw him at different times during his sickness, and testifies that he didn't notice any change in his mind; that he was weaker; that he thought he was just as strong in his mind as always. The wife of proponent and the widow also testified. Without going into further detail as to the evidence, we are of opinion that the evidence is not sufficient to sustain a verdict for contestants, had the case been submitted to the jury, and that, therefore, the trial court rightly directed a verdict.

There is no evidence in the record as to the disease with which testator was afflicted, except the testimony of some of the lay witnesses as to his complaints. There is nothing to show any progressive mental disease. Deceased was better some days than others. None of those who were present at the time the will was executed, testify to a condition indicating mental incapacity at the time the will was executed. There is no evidence of undue influence. Without reviewing the cases bearing upon the question as to the mental capacity, we content ourselves with citing one or two of the more recent cases, wherein are cited a number of our cases. See *Byrne v. Byrne*, 186 Iowa 346; *In re Eddy's Will*, (Iowa) 173 N. W. 931 (not officially reported).

One or two minor matters are suggested in argument, but no errors are assigned, nor are there brief points thereon. On the whole record, we reach the conclusion that the judgment of the trial court ought to be affirmed. It is affirmed. Appellee's amendment to abstract was proper, and the motion to strike and tax costs thereof to appellee is overruled.—*Affirmed*.

Weaver, C. J., Evans and Stevens, JJ., concur.

Salinger, J. (dissenting). If this appeal involved anything other than whether there was capacity to make a last will, I have little doubt we would hold that, upon the evidence exhibited in the opinion itself, that there was a question for a jury. I think it is undeniable that the review here indulged in is a review *de novo*. If that be permissible, it might well be claimed that the conclusion reached is the right one. It may be conceded· that, were we sitting as jurors, we would hold, on this evidence, that the will was valid. But, in my opinion, such review of the evidence on our part is treating this appeal as a chancery appeal, without saying so. On review of a verdict, or the refusal to submit to a jury, we should not determine what evidence shows or fails to show by our personal beliefs. On such review, the only question is whether reasonable minds may differ on what the evidence establishes or fails to establish. It is not to be denied, either, that this opinion is sanctioned by other of our decisions. My position is that those decisions should be overruled, because the Constitution prohibits what they permit. 'As said before, in my opinion, there is reasonable room for differing on whether the testator was or was not competent. I do not care to lengthen this dispute by a fuller analysis. Indeed, no enlargement would be helpful, because the testimony set out in the opinion itself seems to me to demonstrate that the conclusion reached is wrong. I wish but to add that this particular opinion runs true to type, also, in failing to give weight to such unnatural dis-

position as there may be. It is true that, if you once grant that a testator is sane, it becomes immaterial that he has made undue discrimination in his gifts. Once grant the testator is sane, and the courts cannot interfere because he has made an unnatural will. But when the inquiry is whether he be sane, the fact that his will is unnatural is circumstantial evidence that he was not sane. Once grant that the testator is competent to make a will, and the courts may not set that will aside, even though he disinherits his only child, with whom he has been on affectionate terms, that child being crippled, and left penniless because the father has willed his all to an utter stranger. As said, if it be admitted that the man who made such a will is sane, there is an end. But surely, that he made such a will would be very persuasive evidence of lack of capacity, when capacity was in inquiry instead of being granted.

**WILLS:** Testamentary Capacity—Evidence. Evidence reviewed, and held insufficient to support a verdict of mental incompetency to execute a will.

SALINGER, J., dissents.