SUTHERLAND STATE BANK, Appellee, v. MAUDE C. FURGASON et al., Appellants.

**DEEDS: Undue Influence—Importunity and Persuasion.** Principle re-
1 affirmed that undue influence in the execution of a deed may not be predicated on importunities, requests, and persuasions, so long as they do not go to the point of overthrowing the *will* of grantor.

**DEEDS: Mental Incompetency—Forgetfulness and Age.** Principle re-
2 affirmed that the clear, convincing, and satisfactory showing necessary to set aside a deed on the ground of mental incompetency is not necessarily established by a mere showing that the grantor was aged and forgetful.

*Appeal from Cherokee District Court.*—C. C. BRADLEY, Judge.

### JANUARY 20, 1922.

SUIT in equity, for cancellation of a deed made by Jane A. Bailey to Jennie E. McCulla and Maude C. Furgason, appellants, of a quarter section of land, on the grounds that the grantor was mentally incompetent to execute the deed; that the deed was secured by undue influence; and that the deed was never delivered. The facts appear in the opinion. Decree was entered, canceling the deed. The grantees in the deed appeal.— *Reversed.*

*Molyneux & Maher* and *C. D. Meloy*, for appellants.

*Walter McCulla* and *Herrick & Herrick*, for appellee.

FAVILLE, J.—I. The questions presented for our determination are largely questions of fact. The law in cases of this character is well established. We are confronted with the not unusual situation where an attempt is made to set aside a deed executed by an elderly person, on the familiar twofold ground of an alleged want of mental capacity to execute the deed and a claim of undue influence. The action is brought by a guardian. The record discloses that Cyrenus Bailey and his wife, Jane A. Bailey, lived on a farm in Cherokee County, Iowa, and were the parents of seven children. One of the Bailey daughters, Emma, married a man by the name of Hinds, and lived in the state of Texas. Emma Hinds died, leaving surviving her two daughters, who continued for some time to live with their father, but finally, at the solicitation of the elder Bailey, came to Cherokee County, Iowa, to live with their grandparents on the farm in question. These daughters have each since married, and are the defendants Maude C. Furgason and Jennie E. McCulla. While they were living on the place with their grandparents, Jennie did most of the housework. Maude taught school a portion of the time, and helped with the housework when not teaching, and when she was teaching, she paid her grandmother for her board, and Jennie was paid $2.00 a week for her services.

1, DEEDS: undue influence: importunity and persuasion.

Maude married in 1900, and moved from the farm.  Jennie continued to live with the old people thereafter, and was subsequently married, and has continued to reside on the farm ever since.  The old gentleman died in 1905; and after his death, the widow left the farm and went to live with some of her children, residing part of the time with a son, Asa; and at the time of the transactions involved in this suit, she was living with her daughter, Mrs. Flinders.

On March 10, 1898, Cyrenus Bailey executed a deed to the quarter section of land in controversy to his wife, Jane A. Bailey.  This deed was not recorded until the 25th day of August, 1919.  On October 13, 1904, Jane A. Bailey made a will, by the terms of which she provided for the payment of $1,000 to the granddaughter, Maude Furgason, and made the payment of the same a lien upon the real estate in controversy.  She devised the said real estate to Jennie McCulla, subject to the dower interest of her husband, in the event that he should survive her.  During the summer of 1919, there were several conversations between Mr. and Mrs. Furgason and Mr. and Mrs. McCulla in regard to the property.  McCulla claimed to Furgason that he could hold the property by adverse possession, and Furgason learned through Asa Bailey, son of Cyrenus Bailey, that a will had been made by Mrs. Bailey, by the terms of which Jennie was to get the farm, and Maude was to get $1,000.  On the 30th day of August, 1919, Furgason and his wife went to Sutherland, for the purpose of seeing Mrs. Bailey.  At that time, the old lady was living there with her daughter, Mrs. Flinders.  Furgason informed them that he and his wife came for the purpose of talking over affairs in regard to the Bailey property, and Mrs. Flinders said that she would rather that the matter would not be discussed until the brother, Asa, could get there.  She immediately called Asa over the telephone, and he came down to the Flinders house.  This was in the forenoon.  Furgason and his wife went home with Asa to dinner.  There was little conversation in the presence of Mrs. Bailey in the forenoon.  In the afternoon, the two Furgasons and Asa Bailey returned to the Flinders home, and in the meantime, Asa had telephoned to the bank for the cashier, Mr. Bark, and requested him to come to the Flinders home.  Jennie McCulla

and her husband were also sent for, and they came to the conference. It was at this conference that the deed in question was executed. Various parties who were present at the time were witnesses upon the trial.

Mrs. Flinders, a witness for the plaintiff, testified in regard to the transaction. She stated that Maude said to Mrs. Bailey:

"Now, grandmother, is it right for Jennie to have that farm? It is your farm. Is it right for Jennie to have the farm, and me just $1,000?"

She testified that she did not remember what her mother said in response to this. She also testified that Mr. Furgason was insisting that Asa Bailey and the banker, Mr. Bark, should settle it; that he wanted it settled.

With regard to the threat of a lawsuit, Mrs. Flinders testified, referring to Mr. Furgason:

"He said that afternoon that, if it wasn't settled, that he was going to bring an action against Asa, to find out where father's property had gone. I do not know whether it was in her presence—right in front of her; but she was there."

The banker, Jordan, was called as a witness by the plaintiff, and testified that, when he went to the house on the day in question, Mrs. Bailey spoke to him when he went in. He did not remember what she said. He said:

"I don't remember who finally stated what was wanted of me that day. I understood it was her request the deed was to be drawn. I don't remember who told me. I don't know who asked me. I don't remember whether Mr. Furgason or Mrs. Furgason told me the object of the visit."

"Q. Did Mrs. Bailey make any statement, when you asked her what you were there for, that you would have to inquire of someone else, or any words to that effect? A. Something was said to that effect, but I don't remember exactly what it was. Q. Well, approximately, as near as you can remember, what was said? A. It seems to me it was something on this order,—'You will have to ask the others what was wanted;' but I don't think those were exactly the words, but something on that line."

This witness further testified:

"I don't remember that Maude Furgason spoke up and said, 'Grandma wants to deed this place to Jennie and me, each

half,' or something like that, and that I then said to her, 'Is that right, Grandma?' * * * I am quite sure I did read the deed to her, of course. Yes, I took her acknowledgment, and I was very particular to ask her if it was her own voluntary act and deed. She said, 'Yes.' * * * I was not at the house over half an hour on the day the deed was signed. During that period, I did not hear Lew Furgason or his wife, Maude Furgason, make any threats to Grandma Bailey as to what they would do if she didn't give them the deed to the land. I did not hear them make the threats about lawsuits to anyone else there in the house, nor I did not hear them make any threats in her presence as to a suit against Asa Bailey or Mrs. Flinders. Nothing of a threatening nature was said in my presence in the house, either before or after she signed that deed.''

Furgason stated to Bark and Asa Bailey, outside the house:

''I will fight you until hell freezes over. I am telling you this so you will have no misunderstanding.''

This statement was not made in the presence of Mrs. Bailey, and there is no evidence that she ever heard of it.

The witness Shumway, who was in no way interested in the transaction, and was called in as a witness to the deed, testified in regard to what took place at the time. He said:

''The first I remember of the conversation there, Mr. Jordan says to Mrs. Bailey, 'Did you send for me?' And she turned him off some way,—joshed with him a little; and I think he asked her the second time if she had sent for him, and what she wanted. He asked her this question, and she put him off the first time, and the second time I think she made the remark she didn't know, and * * * Mrs. Flinders says: 'Yes, you do, mother, he was called here to execute a deed wherein you convey your home property down there where you used to live, and the girls and the children lived with you, to these girls, Maude and Jennie; and you are to sign and execute a deed conveying this property to these girls equally.' And then she says, 'Lew, you better state your case,' and Lew said he didn't feel like doing that. Mrs. Flinders said this,—she just said: 'Yes, you do, mother, it is to draw up a deed for you to sign.' It was Mrs. Flinders said to Mr. Furgason, 'You had better state your case.' I think Mr. Furgason said he thought it would be more

in place for one of the girls to do that, and Maude, his wife, started in, and she was confused a little, and Mrs. Flinders spoke up, and she says: 'Jennie, maybe you better do that; you are a better talker.' And then Jennie stated the case very clearly. Jennie said she supposed she might as well go back to the time that they were both girls at the Bailey home on the farm, and she said they came there to make their home there, and after they had been there for a time, it was the general talk of the old folks, and among all of them, that in time that place was to be divided equally among the girls. She said that was the understanding, and she thought that was Maude's understanding. She said she never knew anything different till she took a trip out west, and an aunt out there says to her, 'What has happened, or what is the reason that Maude doesn't get an equal share with you?' And she said then, she says, 'That was as much a surprise to me as it could be for Maude, because I supposed all the time that it was to be divided, and divided equally, because I know of no reason why it should not be.' And she said, when she got back, 'I didn't know just how, but I felt it my duty to Maude to—' She said this in the presence of Jane A. Bailey. She said further: 'We were mere children; we didn't understand anything about business; and I says that we should look after her interests and protect her rights,—that was a duty in that respect, and that is why we are situated as we are today.' She said, 'As I understand it, under the present arrangement, I am the beneficiary of that. If it goes according to my desires and my wishes, it should be divided equally. I don't want any other arrangement but that Maude should share and share alike with me.' It was *Jennie* said this. And she says, 'Ben isn't quite satisfied;' but she said she looked for the harmony of the family, and that had some weight with her, and the justice and the equity appealed to her; and she said, 'We will get along some way.' "

On rebuttal, this evidence was denied. This witness is a business man and outsider.

Bark, another outsider, who was also a witness for the plaintiff, testified:

"I did not hear Lew Furgason threaten her that day. He was very insistent on a settlement to be made that day. In the

presence of all that was there, he said it could just as well be settled now as any time. I do not remember of his making any threats. Asa Bailey, Ann Flinders, and myself and all of the others were there when he made that statement. He came right out; did not hesitate when he made it."

We fail to find in the testimony any evidence that would justify a finding that the grantor, Mrs. Bailey, was persuaded to execute the deed in question by any threat, coercion, or undue influence of any kind or character. This transaction was not done in a corner. There was no attempt to unduly persuade this old lady to make a deed when she did not wish to do so. On the contrary, the entire transaction, from beginning to end, was open and aboveboard. No one can gainsay the fact that, when Furgason and his wife discovered that the grandmother had made a will, giving the property in question to Mrs. McCulla and $1,000 to Mrs. Furgason, they had a perfect right to inquire of the grandmother in regard to the matter, and to reasonably appeal to her sense of justice, and to request her to change such disposition of her property. Time and again we have held that importunity, requests, and persuasion that do not go to the point of overthrowing the will of a grantor or testator, are insufficient to sustain a finding of undue influence. Certainly, if Furgason and his wife were seeking to unduly influence the old lady, they went about it in a strange and unusual way. They called at her home, where she was in the presence of her adult daughter, an experienced business woman; they talked to the daughter about the matter, and acquiesced in sending for the son, Asa, who, the record shows, was a business man, of wealth and experience. Furgason and his wife went home with Asa to dinner, and then they returned to Mrs. Bailey's home. Asa himself summoned the banker, Bark; and then the people most vitally interested, to wit, McCulla and his wife, were sent for, that they might be present at the conference; and all that took place was done openly and in the presence of all these parties. Whatever color may be put upon these circumstances by those most vitally interested in seeking to impeach the deed, the indisputable facts show that the conference was held, not only in the presence of all of the interested parties

and of the daughter, Mrs. Flinders, and the son, Asa, but also of outsiders.

We are persuaded from the record that there was a full and complete understanding between the parties at the time; that the sisters, Jennie and Maude, were not hostile to each other; that Jennie and her husband fully understood all that was going on, and by their acts, if not by their express words, acquiesced in all that was done; and that no undue influence or persuasion was exercised upon the mind of Jane Bailey, to persuade her to execute the deed in controversy. Undue influence is not exercised by inviting the party most vitally interested in the transaction to come in, and not only witness the transaction, but to participate in bringing about the execution of the instrument that is afterwards called in question. A transaction of this character, conducted in a family conference in the way in which this was done, should not be impeached upon such a showing as is made in this case, on the ground that undue influence was exercised.

II. The other question in the case is the usual and ordinary question of the mental incapacity of the grantor. True, she was a woman 93 years of age, but this fact alone does not establish mental incompetency. Her own testimony, taken by deposition months after the transaction, shows that she had mind sufficient to exercise judgment, discretion, and choice in the making of this deed. Witnesses were called to testify to her mental condition. The son, Asa Bailey, who had lived close to her for many years, and whose relations with her had been very intimate, and who was a witness for the plaintiff, testified:

"I am not willing to say my mother is of unsound mind. She is of sound mind as far back as my memory goes. She doesn't know any ailment. She is perfect to my mind."

The daughter, Anna Flinders, with whom the old lady lived, and who was also a witness for the plaintiff in this action, testified, on cross-examination:

"No, mother is not insane; she is a loving, dear mother. She is simply weak mentally. She hasn't a particle of insanity about her—not a bit."

Said witness testified, on direct examination:

"She lives in her young days with her parents on the old

farm in New York.  She says, 'My heart goes back to my old home.'  She repeats things, and when she reads—I hear her reading out loud.  I love to hear her read; she reads very well.  She is often asking who is passing by.  We have lived there four years, and some parties have passed by three times a day, and she doesn't know them.  I say, 'Mother, can't you recognize them from their movements and their step?' and she says, 'No.'  That is one thing.  In talking with people, her usual form of greeting is, 'Where do you come from, where did your parents come from, what nationality was your father, and what nationality was your mother?'  She loves to deal in nationalities of people.  That is the ordinary conversation with most everyone she meets,—even those she meets every day almost.  I have heard her ask that same question many times.  Some of the people that come to the house quite frequently, she recognizes.  Some that she has known for a long time.  She knows Mr. Jordan and knows Mr. Parker, and just a few of them that she is sure of.  Those that she has met just a few times, she asks me who they are, when they come in to visit there.  Whenever anyone comes in that she does not remember, she asks me who they are.  There is hardly a day passes but what someone comes in she should know, that she don't remember them.  If some person comes in once a week, it all depends on who they are, as to whether or not she would recognize them.  She doesn't know all of our neighbors.  Some of them, some of the older people, she knows.  She doesn't recognize young people, but the older ones.''

Mrs. Warren testified for the plaintiff that, in her opinion, the grantor was of unsound mind, but on cross-examination, she testified:·

''Well, I guess you would say that my opinions or reasons are based on her forgetfulness.  The change in conversation is forgetfulness.  She is also childish, in the respect that she is asking so many things over and over again.  It is the same thing as the forgetfulness.  That is why I say she is of unsound mind.  I would not say she was insane.  Positively not.  Con-, sidering her age, she has a bright brain.  For a woman of her years, she has a very active brain.  If you talked to her about topics of her girlhood, or your girlhood possibly, or things, subjects, with which she was familiar, she could carry on a con-

versation. She can talk about years ago all right. She can talk about religion or people and carry on a conversation with a great deal of skill. She loves to talk about religion and argue religion. That way, she is really bright and entertaining. I cannot say whether she can talk politics. I am not a judge on that subject. * * * She has quite a sense of humor. Generally she is of a bright, sunny disposition. My reason for saying she is of unsound mind is that she forgets.''

Lawrence Flinders was a witness for the plaintiff on the question of the grantor's mental capacity, and, on cross-examination, he testified:

''I have known Mrs. Bailey all my life. She seems to me to be of perfectly sound mind in every respect, except she is forgetful.''

Bark, who was called as a witness for the plaintiff, also testified on cross-examination:

''I think she was the only person of that age that I have ever done business with. She attempted to discuss religion with me, but I do not discuss religion. She is always jolly and looks on the bright side, or appears to, and when I visit with her, she loves to joke with me. That is sincere with her; she is that kind. I think the old lady is sincere all the time, as far as that is concerned. When I converse with her, she is always quick to reply, and always has a reply ready. I think she has an active brain.''

The only other witness for the plaintiff who attempted to express an opinion that the grantor was mentally incompetent, was the witness Dr. Nichols. He testified as an expert, and gave his conclusion as follows:

''I should say she was mentally unqualified.''

On cross-examination, he said:

''She is insane, to a degree. The form of insanity is senility. Senility is a form of insanity when you get to the age when they are not competent to transact their own business. My authority for the statement that senility is a recognized form of insanity is based on the fact that I am a graduate of the State University of Iowa. I cannot quote to you any medical expert recognized by authorities that states that senility is a form of insanity. I have no book or treatise in mind that describes senility as a

form of insanity. I did not specialize in any manner in mental disturbances or diseases. I had no special training in cases of mental disorders. I do think I am qualified as an expert to determine the mental disorders of a patient of that age.''

In behalf of the defendants, Mrs. Morey testified:

''I talked with her, and have had frequent opportunities to visit with her. From my acquaintance, associations, and conversations with her, I would say she is of sound mind. She is old, and a little forgetful. I think she is bright in her conversation, for her age. She is rather given to jokes. She doesn't seem to worry about her condition, present or future. She is just a happy old lady. I don't know whether she is more than ordinarily bright for her age. I haven't known anyone else that old, but I think she must be. I should say that she is bright.''

Mrs. John Bruner, who had known Mrs. Bailey for 30 or 35 years, testified:

''I should say she was an unusually keen old lady, for a woman of her years. She is of a sunny disposition, and quite religious.''

Frank Bruner, witness for the defendants, who had known Mrs. Bailey 25 years, and had talked with her and observed her, said:

''Her disposition is pleasant. From my conversations with her, my observation of her, I would say she was of sound mind. There is no trace of insanity. She is somewhat forgetful. I have never noticed any weakness of her mind.''

Phineas Morey testified:

''I am well acquainted with Mrs. Bailey. There is a warm friendship between us, as far as I know. I have a sincere admiration for her. I would say she has an excellent mind. She is somewhat forgetful. Otherwise, there was nothing that I have noticed that would indicate any insanity, or unsoundness of mind. * * * It is my opinion she wouldn't be easily influenced, even by a relative.''

B. L. Cobb, a witness who had known Mrs. Bailey for the last 10 years, described his dealings with her, and said:

''We have discussed general topics in visiting, as one nor-

mally would discuss. * * * She is just a kindly, good-natured old lady. She is a well preserved person, for her age.''

Dr. George Donohoe, superintendent of the state hospital of Cherokee, was a witness in behalf of the defendant. He testified as an expert, and in regard to a personal observation and examination of Mrs. Bailey. He testified as follows:

"Why, I thought she was of sound mind. From my observation of her, with the fact that her family physician reports that she has no organic trouble, has a sunny disposition, and good appetite, I would think she was of sound mind. I found her to be a woman of sunny disposition. She talked about the Bible. She had remarkably quick replies for anyone. From my observation last Tuesday, I did not find any evidence of insanity or unsoundness of mind. Conceding that her condition was the same in August last as it was on Tuesday last, I should say it was sound mind. Jane A. Bailey would not be easily influenced into doing something that she didn't wish to do, simply by love.''

This witness was present at the time that the deposition of Mrs. Bailey was taken that was used in this case, and testified in part in regard to his observations made at said time.

Upon the trial of this action, Mrs. Bailey herself was a witness, and she testified in regard to the transaction about the deed. Her deposition was taken in February, 1920. A portion of her testimony is as follows:

"I was born 1826. I am in my 93d year, sir. I cannot tell you when I was married. It is in the Bible, I guess. Anna [speaking to a relative in the house], can you tell that? Twenty-six, as near as I can remember. My husband's name was Cyrenus Bailey. 'Is that a Bible name?' Yes, sir, it is a Bible name. I have seven children. Of my children, Anna Flinders and Asa Bailey are still living, and they are honest, upright children; you always find them right there; there is no quibble about them. Just those two are married. I had another daughter, Emma, married Byron Hinds, and she had two girls, Maude Furgason and Ben McCulla's wife, Jennie McCulla. These girls were not born around here. They lived in Texas. Cannot tell you the name of the town. They came to live with me. Their mother died; she died over in Nebraska.

She lays there now. My husband and I sent for the two girls. They came to live with us in Cherokee County, and both married there. On the farm where Ben lives now. Maude Furgason lives on the farm down near where Ben McCulla lives. She lives on the old home Furgason place. Mrs. Furgason has quite a family—five or six. A girl and four boys, I think. Lew Furgason came up here last summer and talked with me about making a deed to the farm. I can't tell you of any threats he made against me. I don't think he dared to do it. If he made any threats, I have forgiven him. I think he made no threats. I would not do it on any threats. I wanted that farm to go just as my husband wanted it to go. Fathers and mothers of children usually want their property to go to their children. Yes, to their descendants. Who do I want that property to go to—that farm down there? That is a very close question, sir. I don't know as I have got headpiece enough to answer that question. I don't believe I have,—my head is gone. I can't remember who I want that property to go to. My boy has got enough. He don't want any, and Mrs. Flinders is well taken care of. She takes care of me; I take care of her. I bought this [referring to the house in which they live]. This is my own property. Yes, I am well taken care of; my wants are all supplied.''

Both McCulla and his wife were witnesses, but neither testified that they regarded the grandmother as at all mentally incompetent.

III. In cases of this character, we are compelled to determine the questions of fact *de novo*. Other similar cases involving fact questions cannot materially aid us, but there are certain well recognized and established rules that obtain in cases of this character which cannot be ignored or lightly set aside. Time and again we have declared that, in actions to set aside a deed on the grounds of mental incapacity and undue influence, the proof must be clear, convincing, and satisfactory. *Evers v. Webb,* 186 Iowa 1172; *Bradley v. Bradley,* 185 Iowa 1272; *Butters v. Butters,* (Iowa) 177 N. W. 471 (not officially reported); *In re Will of Boyle,* 186 Iowa 216; *Nixon v. Klise,* 160 Iowa 238; *Münch v. Münch,* 148 Iowa 18; *Altig v. Altig,*

137 Iowa 420; *Steen v. Steen,* 169 Iowa 266; *McMahon v. Hassett,* (Iowa) 176 N. W. 707 (not officially reported).

Solemn instruments affecting the title to real estate are not to be disturbed unless upon such proof as clearly and convincingly establishes that such instruments are not the free and voluntary act of a person possessed of sufficient mentality to have executed the same intelligently. The burden of proof is upon the plaintiff, to prove the undue influence and the mental incapacity alleged. *Zinkula v. Zinkula,* 171 Iowa 287; *Perkins v. Perkins,* 116 Iowa 253; *Dean v. Dean,* 131 Iowa 487; *Reeves v. Howard,* 118 Iowa 121; *Gates v. Cole,* 137 Iowa 613; *Gilmore v. Griffith,* 187 Iowa 327; *Vannest v. Murphy,* 135 Iowa 123; *Brackey v. Brackey,* 151 Iowa 99.

We do not think the appellee has carried such burden, either with regard to undue influence or mental incapacity. Our pronouncements on these propositions are not infrequent nor obscure. With consistency, we have repeatedly declared that, if a deed or will is executed at the suggestion or request of the grantee or devisee, such fact will not establish undue influence unless the freedom of the will of the party executing the instrument is overcome, and the will of another substituted therefor. *Mallow v. Walker,* 115 Iowa 238; *Slaughter v. McManigal,* 138 Iowa 643; *Olsen v. Olsen,* 168 Iowa 634; *Steen v. Steen,* supra; *In re Will of Eveleth,* 177 Iowa 716; *Johnson v. Johnson,* 134 Iowa 33.

In *In re Estate of Townsend,* 128 Iowa 621, we said:

"Neither advice nor solicitation, however earnest and insistent, will vitiate a will, unless it be further shown that the freedom of the will was in some way impaired or destroyed thereby."

In *Zinkula v. Zinkula,* supra, we said:

"To entitle plaintiffs to recover in this suit, they must establish by a preponderance of the evidence that the instrument in question does not express the mind of the testator. To this end, one of two facts must affirmatively appear: Either that the testator, at the time of the making of the will, was mentally incompetent to make a will, or that his mind was so unduly influenced by his wife in the making of it that it did not express

his will and purpose, but rather the will and purpose of his wife.''

An examination of the facts in the cited cases will disclose in many of them evidence tending to show undue influence that exceeds anything established in the instant case, and yet we have held it to be insufficient to justify the setting aside of the instrument under attack.

There is some testimony in the record and some claim made that, prior to the execution of the deed from Mr. Bailey to his wife, there was an agreement between them with reference to the disposition of the property; and that such agreement was that, after the death of Mrs. Bailey, the farm was to go to Jennie McCulla, who was to have it by paying Maude Furgason $1,000. The evidence of the witness who testified in regard to this alleged agreement is that it was reduced to writing in the form of a joint will, executed by Bailey and his wife, which, however, does not appear in the record; and we are unable to find any competent evidence in the record to sustain the claim of any such agreement between Bailey and his wife. Considering the then value of the land, there was no such great disparity between the contemplated gifts to the granddaughters, in the nineties, when the so-called ''agreement'' was made, as was obvious in the year 1919.

In this connection, it might not be out of place to suggest that, if Furgason and his wife were seeking to obtain this property by undue influence, they would more naturally have proceeded to endeavor to secure all of it, unbeknown to Mrs. McCulla, rather than to have invited her and her husband to a conference, and suggested to them, as well as to Mrs. Bailey, the fairness of having the property divided equally.

It is needless to prolong the discussion further. We do not think the appellee sustained its claim of undue influence, under the rules previously laid down by us.

Was the grantor mentally incompetent to execute a deed? On this proposition also our pronouncements have been frequent. We are firmly committed to the rule that mental

2. DEEDS: mental incompetency: forgetfulness and age.

capacity to dispose of property by deed may exist, even though there be no longer mental or physical capacity to do business generally.

*Leonard v. Shane,* 182 Iowa 1135; *Prusha v. Prusha,* 187 Iowa 637. Time and again we have declared that mere old age and the impairment of physical powers incident thereto, forgetfulness, failure to readily recognize friends, and "living in the past," by recalling the incidents and personages of by-gone days, are not proof of mental incompetency sufficient to impeach a deed or will. *Altig v. Altig,* supra; *In re Will of Stufflebeam,* 135 Iowa 338; *Zinkula v. Zinkula,* supra; *Byrne v. Byrne,* 186 Iowa 345; *Bales v. Bales,* 164 Iowa 257; *Speer v. Speer,* 146 Iowa 6; *In re Will of Kester,* 183 Iowa 1336; *In re Eddy's Will,* (Iowa) 173 N. W. 931 (not officially reported); *In re Estate of Bresler,* 188 Iowa 458.

Conceding the rule that a higher degree of mental capacity may be required to execute a contract or a deed than a will, still the evidence in this case falls far short of that clear and convincing proof of mental incapacity that is essential to the impeachment of a deed. It would unduly extend this opinion to attempt a review of our former holdings and a comparison of the evidence in such cases with that of the instant case. Without reviewing the evidence further in detail, we have here a picture of an old lady of advanced years, in good health, for one of her age, living with her daughter. She has a sunny disposition, is jovial and happy. She is fond of reading. She loves her Bible. She knows her old neighbors and her relatives. She knows what property she owns, both as to residence and farm. She is forgetful, but has no vagaries, no hallucinations, no delusions, no marked eccentricities. The son, who has been her confidant and on most intimate terms with her, says:

"I am not willing to say my mother is of unsound mind. She is of sound mind as far back as my memory goes. She doesn't know any ailment. She is perfect to my mind."

The daughter, with whom she lives, voices her final conclusion by saying:

"No, mother is not insane; she is a loving, dear mother. She is simply weak mentally."

The doctor who examined her testified that her answers were rather quick and sharp, and that she was sometimes evasive, and that she was not of unsound mind or mentally incompetent. In her advanced years, she undoubtedly was affected with phys-

ical and mental deterioration. There was not the keenness and alertness of middle age. She relied more on others than in former years. In the conversation at the house, she referred to her daughter and her son, to verify her statements and for information. But we think she knew what she was doing. She discussed what she had previously done. She talked about her will. She argued the matter with the children and grand-children, and decided to make the deed as they had all talked, and as it had been fully explained to her. The deed was read over to her, and she asked whether she should sign it as "Mrs. Cyrenus Bailey" or as "Jane A. Bailey." She practiced writing her name on a piece of paper, and then signed and acknowledged the deed.

We do not draw a conclusion from the record that the deed was obtained by undue influence, or that this old lady was incompetent to make a deed at the time she executed this instrument. We do not think the evidence in behalf of the appellee reaches the degree of proof required in a case of this kind to vacate a deed.

We find sufficient evidence of delivery.

The case must be, and it is,—*Reversed.*

STEVENS, C. J., EVANS and ARTHUR, JJ., concur.