EMILY M. REEVES, Appellee, v. LYDIA J. HOWARD, Appellant.

Action to Set Aside Conveyance: PLEADING: WHEN OBJECTIONS MUST BE MADE: An objection that a petition does not state a cause of action cannot be taken advantage of for the first time on appeal.

Undue Influence Defined: EVIDENCE: Undue influence necessary to set aside conveyance of property must be such as in effect destroys the free agency of the person acted upon, and substitutes the will of another person for his own. Evidence examined.

Confidential Relation: BURDEN OF PROOF. The single fact that grantor and grantee were brother and sister does not establish such a confidential relation as to raise a presumption of fraud, and place the burden of proof upon the one claiming the benefits under a deed.

Conveyance: TITLE: GIFTS CAUSA MORTIS. Real property conveyed
4   by deed absolute in form and fully delivered in the life-
time of the grantor, though in his last hours and as a gift,
passes the title at once and the transaction does not come
within the law of gifts *causa mortis*.

*Appeal from Plymouth District Court.*—HON. GEORGE W.
WAKEFIELD, Judge.

TUESDAY, OCTOBER 21, 1902.

ACTION in equity to set aside and declare void certain
deeds by which one Harmess J. Howard conveyed real
estate to the defendant. Decree as prayed, and defendant
appeals.—*Reversed.*

*Martin & Martin* for appellant.

*I. S. Struble* for appellee.

WEAVER, J.—The plaintiff and defendant are sisters.
On May 23, 1898, Harmess J. Howard, a brother of these
parties, being upon his deathbed, made, executed, and
delivered to defendant deeds for four several tracts of real
estate of the value of $4,000 to $6,000, the express consid-
eration of such conveyances being "one dollar and natural
love and affection," and immediately after executing said
deeds also executed a will bequeathing the remainder of
his estate, being personalty of the value of $500 to $700,
to plaintiff and another sister, Mrs. McKean, in equal
shares. Two or three days later Harmess J. Howard died,
and his will has since been duly admitted to probate.
The plaintiff refused to accept any benefits under the will,
and brings this action, alleging that at the time Howard
made the conveyances to defendant he was ill, and in
such weakened condition of mind as to be easily subjected
to undue influence exercised by his friends and attendants;
that in years previous to this sickness defendant had

shown great kindness and attention to her said brother, and thus obtained his confidence and affection, and exercised great influence over him; that taking advantage of his sick and weakened condition, she, by her own undue solicitation and influence, and by the undue solicitation and influence of Mrs. McKean, induced and persuaded the said Harmess, against his natural inclination, to make said conveyances without any consideration whatever. Upon these allegations it is demanded the deeds be held void.    Defendant denies all allegations of undue influence in the procurement of the deeds from her brother.

I.    It is first urged by appellant that the petition states no cause of action, in that it does not allege nor state facts showing that she is an heir at law of Harmess J. Howard, or has any such interest in his estate as will enable her to maintain this action. No such question was raised in the court below, and we think defendant cannot take advantage of the defect here.    *Weis v. Morris*, 102 Iowa, 327; *Benjamin v. Vieth*, 80 Iowa, 149; *Bank v. Zeims*, 93 Iowa, 140; *Wood v. Denham*, 105 Iowa, 701.

1. PLEADING: when objection must be made.

II.    As will be observed, plaintiff's demand for relief is based solely upon the charge that the deeds were procured by the exercise of undue influence over the grantor, and it is necessary for us to look closely into the evidence upon which the decree of the trial court is sought to be sustained.    During his last sickness of about two weeks Howard lived at the home of a neighbor.    Both plaintiff and defendant were living at a distance, but, upon being notified of his condition, both came, and were in attendance upon him for several days preceding his decease.    The exact nature of the fatal sickness is not disclosed by the record, but soon after the sisters arrived Howard developed a tendency to convulsions of an epileptic character.    At the outset these attacks occurred at intervals of several hours, but increased

2. UNDUE influence: insufficient evidence of.

in frequency, and from Monday, until death occurred on Wednesday or Thursday, he rapidly declined. During the paroxysms he was more or less unconscious, and, of course, unfit to transact business, but during the intervals he appears to have been entirely sane. The physician who attended him says that the tendency of the convulsions was to leave the patient dull for a while, but "he would grow clearer afterwards;" that on Sunday he found him "nervous, shaky, and not clear in mind," and was informed he had been having a convulsion; and the witness adds: "His mind cleared up while I was there Sunday evening, and he appreciated what was said to him, and answered my questions, but was nervous, and easily excited. How clear his conceptions were I could not say. The conversation he directed to me was intelligent and connected. He said some things out of the way. The tendency was to become brighter, and I would expect his mind to improve." This report has reference to a time about three hours before the papers were executed, and we find nothing in the record to indicate there was any change for the worse in the sick man's mental condition during the interval. Of the many witnesses testifying for plaintiff concerning Howard's mental condition most of them did not see him during his sickness until after the deeds had been executed and delivered. But one (Daniel McArthur), aside from parties in interest, undertakes to say that he saw signs of mental wandering before the deeds were made, and he in another place says he did not notice the change in the sick man "until after he begun to have convulsions." Another (J. Alderson) says, "Howard conversed connectedly between spasms on Monday," and further says that, "After the deeds were signed, he was able to talk intelligently, but not much after that." The testimony, therefore, aided as it is by the legal presumption of mental soundness, makes it too clear for successful dispute that Howard, while weak and suffering in body,—too weak,

doubtless, to endure the the strain of any business requiring great mental effort,—was fully conscious of the nature and effect of his act, and had full and intelligent appreciation of the fact that he was thereby conveying the property in controversy to the defendant. True, he was in that weakened condition which might have made him the easy prey of a designing person, and, if there was anything in the record fairly tending to show that the defendant did take advantage of his weakness or exhaustion to procure from him the gift of this property, we should not hesitate to affirm the decree appealed from; but when we take up the question whether defendant did directly or indirectly thus secure the conveyances attacked in this case, we are constrained to say that there is a signal failure of proof.

As we have seen, the defendant resided at some distance from her brother, and there is no showing that she had recently seen him or communicated with him prior to the time she was summoned to his deathbed. There is not a word of testimony that up to the time of that meeting she had in any manner or by any means sought to influence his action in the disposition of his property. From the time of her arrival until her brother's death, though surrounded by numerous witnesses, few of whom can be accused of partiality for her, none of them (with one exception, hereafter noted) testify to any word or act on her part directly or indirectly indicating a desire to control his actions in selecting a beneficiary of his bounty. If witnesses tell the truth, she did on this and other occasions manifest a grasping disposition and a strange want of feeling, but not one of them testifies to having heard her mention the subject of property to her sick brother, nor make any request or suggestion to him as to how he should dispose of it, and the only person who did broach the subject to him expressly says she did it of her own accord, and not upon the request or in the presence or hearing of the defendant. She may have been anxious to obtain the

property, but there is no evidence whatever to show that she brought the least pressure to bear upon her brother to accomplish that desire. The one exception to this statement.is to be found in the testimony of the sister Mrs. McKean, corroborated in some minor points by her husband, and there are portions of her story which do not commend themselves to our entire confidence. She states in substance, that upon coming to see her brother .a few days before his death she there met the defendant, who said to her: "Harmess wants me to have his property. Do you care?" to which the witness responded, "I do not know as I do." Later she says Howard told her he was going to make his will and, being asked by her whom he wanted to have his property, he replied, "My three sisters," and further said he would give his farm to the defendant, and his store and cottage to the plaintiff and witness. She then testifies that she went into the other room, where the defendant was, and, upon repeating what her brother had said, defendant angrily accused her of asking for the property, and said, "He would not have given you anything if you had not been here." Upon receiving this rebuke, the witness claims to have returned to her brother, and told him to give all the property to Lydia, and to make deeds, instead of a will. Later on Sunday night, and just before the papers were executed, she further says she had a talk with Howard, as follows: "He said, 'I am not going to sign those papers;' and I said, 'Oh, yes, you will,' and he said, 'No, I won't." I said, 'Oh, yes, you will; you must;' and he said, 'Well, I will.' " She does not claim that defendant asked her to thus persuade her brother to execute the deeds, or that defendant had any knowledge of this peculiar conduct on her part. She says there were several persons in the room when this final conversation was had with Howard, and one person very close to them; but no one is found to corroborate this story. We have to confess we are unable to accord any great weight to this portion

of the witness' testimony. It is unnatural, as well as uncorroborated. If anything can be inferred from the language and conduct of these sisters, neither of them is given to self-renunciation, and that the witness, without being requested to do so, should coerce her weak and dying brother into conveying his estate to another, who, she claims, had manifested a disposition to exclude her from his favor, has an air of improbability, which, to say the least, is hard to dispel. To follow the testimony no further, we think the finding of undue influence cannot be sustained. The mere fact that Howard may have been sick in body or weak of mind when he made the conveyances is not enough to justify us in setting them aside. *Marmon v. Marmon*, 47 Iowa, 122. It must further appear that there was exercised upon the grantor such improper or wrongful constraint, or machination, or such urgency of persuasion as to overpower his will, and induce him to do that which he would not have done if left to act according to his own will and desire. In other words, influence, to be undue, must be such as, in effect, destroys the free agency of the person acted upon, and substitutes the will of another person for his own. *Schmidt v. Schmidt*, 47 Minn. 457 (50 N. W. Rep. 598); *Haydock v. Haydock*, 33 N. J. Eq. 494; *Elkinton v. Brick*, 44 N. J. Eq. 165 (15 Atl. Rep. 391, 1 L. R. A. 161); *Eckert v. Flowry*, 43 Pa. St. 46; *In re Carroll's Will*, 50 Wis. 437 (7 N. W. Rep. 434); Pomeroy, Equity Jurisprudence (2d Ed.) 951, note 1. Not only is there no such influence shown here, but we think it affirmatively appears with sufficient clearness that Harmess J. Howard acted freely, and of his own deliberate purpose, in making the conveyances. It is shown by several witnesses, including some of those testifying on behalf of the plaintiff, that on several occasions he expressed his purpose to give the property to the defendant; and some of these statements were made before his sickness, or at least before his sickness assumed a

serious aspect.   He talked of the matter intelligently for twenty-four hours before the papers were signed, and, although they were prepared early on Sunday, he insisted that the execution be postponed till after midnight, in order that the validity of his conveyances might not be questioned as a violation of the law against Sabbath breaking, and expressed a wish to be kept alive for that purpose, in order that the business might be consummated. When the execution was finally completed, and he was asked what should be done with the deeds, he answered without any prompting or suggestion:   "Give them to Lydia.   They belong to her."   A second reading of the record reveals no escape from the conclusion that the grantor was of sufficiently sound mind to transact the business in hand, that the deeds were voluntarily made and delivered, and that there is a substantial absence of any evidence tending to show that defendant, either by herself or through others, exercised any undue influence or control in the procurement of such conveyances.

III.   Appellee argues that the defendant sustained such confidential relations to Harmess J. Howard that the burden is cast upon her to show affirmatively the absence of fraud and undue influence on her part.

3. CONFIDEN-
TIAL rela-
tion: burden
of proof.

The point is not well made.   Aside from the fact that she was a sister of the grantor, there is nothing whatever upon which to base the idea of confidential relations.   The rule contended for has frequently been applied to transactions between attorney and client, physician and patient, priest and parishioner, guardian and ward, parent and child; but not always or universally even in such cases.   That it might also obtain as between brother and sister, where any relation of dependence or special trust or confidence exists, we have no doubt.   But such fact does not appear in this case.   It is a general rule, too well established to require citation of authorities, that the burden of proof is upon the party who charges

fraud; and the only exception to this rule is where the admitted or proved circumstances are such that, in the absence of evidence, fraud will be presumed.  But there can be no presumption of fraud from the mere fact that such circumstances are alleged to exist,—they must be admitted or proved before any presumption of wrongdoing arises (*Douglass v. Mitchell*, 35 Pa. St. 440); and nothing of that kind appears in this case.  · We think no case can be found where the relationship of brother and sister, both of mature age, living in separate homes, with no special dependence of either upon the other, is held to taint any gift or transfer of property between them with a presumption of fraud.

IV.  It is further said that these conveyances are an attempt to make a gift *causa mortis*, and such a gift of real estate is not recognized in law.  The law of gifts *causa*

4. CONVEY-ANCES: title: gifts causa mortis.
*mortis* which recognizes a transfer of personal property by a title conditional upon the death of the donor is, in the nature of things, inapplicable to the transfer of title to real property.  But there is nothing in this transaction having any resemblance to a gift of personal property *causa mortis*.  The deeds are absolute in form, and fully delivered during· the life of the grantor.  It is true that they constitute a gift, but there is no word or fact in evidence to show that the conveyances were conditional.  The title passed at once.  That a man may lawfully convey his lands as a gift or as a token of love and affection, and that such grantee holds by as perfect title as the grantor could convey, none will deny.  It is equally certain that such right may be exercised with like effect up to the last hour of the grantor's life, even though in so doing he disregards ties of blood and affinity which others might regard as binding moral obligations.  This rule is subject, of course, to the condition that in making such disposition of his property he is

of sound mind, and acts of his own free will and accord; and such seems to be the fact in this case.

The decree of the district court will be REVERSED.