LAURA REED et al., Appellants, v. SIDNEY L. DUNLAP, Appellee.

**DEEDS:** Requisites and Validity—Undue Influence. Evidence reviewed, and held insufficient to establish undue influence.

Headnote 1. 9 C. J. p. 1256; 18 C. J. pp. 445, 447.

*Appeal from Shelby District Court.*—E. B. WOODRUFF, Judge.

DECEMBER 11, 1924.

ACTION to set aside a deed, on the ground of fraud and undue influence. Decree was entered dismissing the petition, and judgment for costs against plaintiffs. Facts appear in the opinion. Plaintiffs appeal.—*Affirmed.*

*Shelby Cullison,* for appellants.

*E. S. White,* for appellee.

ARTHUR, C. J.—I. Plaintiffs and defendant are sisters and brother. The land involved is a farm of 140 acres, in Shelby County, Iowa. Some time prior to 1883, John M. Dunlap and his wife, Mary J. Dunlap, settled in Shelby County, Iowa, upon the 140 acres of land in controversy, which John M. Dunlap had purchased. On December 28, 1883, John M. Dunlap conveyed the farm to his wife, Mary J. Dunlap, who held the title until

October 11, 1916, when the deed in controversy in this action was made to defendant, Sidney L. Dunlap. There were twelve children. Only five of them were living at the time of this trial: Margaret Goodner, Laura Reed, Luiemma Irwin, Mary Alice Beymer, plaintiffs in this action, and Sidney L. Dunlap, defendant. Margaret Goodner is not a party to the action. John M. Dunlap died in 1898, at the age of past 90 years. Mary J. Dunlap died December 12, 1919. She was 90 years old in July before she died. Sidney L. Dunlap and his mother lived on the farm together until her death, in 1919. For some years before he reached his majority, Sidney L. Dunlap operated and managed the farm, sold the grain and live stock, received the proceeds thereof, paid all expenses, and made expenditures on the farm in the way of improvements. When the elder Dunlap conveyed the farm to his wife, in 1883, there was a $1,600 mortgage resting on it, which was probably a part of the original purchase price of the farm; and when the mother conveyed the land to Sidney, in 1916, said incumbrance was still upon the land. In 1915, a mortgage of $6,500 was placed on the farm, of which $1,500 was used in paying off the prior mortgage, and the balance was used in the erection of a new dwelling. Before that time, Sidney had built a corncrib, barn, meal house, and a hog house upon the premises, and paid for them out of the sale of the products of the farm. Also, Sidney had paid the taxes, kept the fences in repair, and paid other expenses about the farm. After the father's death, in 1898, Mrs. Dunlap lived and made her home continuously with Sidney on the farm until her death, in 1919. During this time, the mother received from Sidney her board, lodging, funds for clothing, expenses for a number of journeys to visit her children, money for other purposes, and for spending money. Sidney received no compensation for his services for cultivating and managing the farm, other than his support and the support of his family, after his marriage, in the year 1895, when he was 27 years of age.

The evidence shows that, in 1883, when the elder Dunlap conveyed the farm to his wife, the farm was worth about $20 per acre, and was subject to a mortgage of $1,600; that, when the father died, in 1898, the farm was worth about $40 an acre, and was still subject to the mortgage of $1,600; that, when the

land was conveyed by the mother to Sidney, in 1916, the land was worth from $225 to $250 per acre, and was subject to a mortgage of $6,500; that, for 20 years preceding the death of Mrs. Dunlap, the average annual rental value of the farm was about $6.00 per acre; and that, for the 10 years preceding that period, the rental value was approximately $3.00 per acre; that the taxes during the last 4 years were about $2.00 per acre, and before that time, about $1.00 per acre.

II. The issue on the trial in the court below, and presented on this appeal, is the claim of appellants that the deed in controversy, the deed made by Mary J. Dunlap to appellee, Sidney L. Dunlap, on October 11, 1916, was the result of undue influence of appellee, and the claim of appellee that there was no undue influence exerted by him in the transaction. Appellants take the position that, under the evidence produced, a relation of trust and confidence existed between appellee and his mother at the time of the execution of the deed in controversy; and that appellee has failed to overcome the presumption of undue influence and constructive fraud arising from the existence of such relation.

The position of appellee is that no undue influence was shown; that the record does not justify a presumption of undue influence; and that, if presumption of undue influence arose from confidential relations between appellee and his mother, such presumption is overcome by the undisputed evidence and circumstances surrounding the whole transaction.

There is no issue of the mental competency of Mary J. Dunlap. In argument, counsel for appellants makes no claim of active fraud or overreaching on the part of appellee. Discussed in argument is the question of constructive fraud in the procurement of the deed by appellee from his mother: that is, that the alleged confidential relation between the mother and son raised a presumption of fraud, and that this presumption appellee has failed to remove by the evidence and circumstances bearing on the whole transaction.

III. The law applicable to cases of this character is well settled, and citation of authorities is not required. It may be said that, if appellants have failed to establish that the execution of the deed in question was procured by exercise of undue in-

fluence, the decree should be affirmed. The law applicable not being in dispute, the main issue as to whether the deed was obtained by undue influence is one of fact. We deem it not profitable to recite or review the entire testimony, but statement of the principal facts and circumstances, concerning which there is little or no dispute, will be helpful.

IV.  At the time the farm was purchased, in 1883, it was worth about $20 per acre, or a total of $2,800. It had resting upon it a mortgage of $1,600, more than one half its value. Shortly after the original purchase, in the same year, the elder Dunlap conveyed the land to his wife, Mary J. Dunlap, subject to the $1,600 mortgage. It appears from the testimony of neighbors of that early time that, several years before appellee reached his majority, he did the work on the farm, bought and sold stock, and attended to the business of the farm generally; that such was the situation before the death of the father, on up to when appellee was married, and continuing to his mother's death. Appellee paid the indebtedness on the farm, repaired the buildings, built a new house, barn, crib, and outbuildings. Appellee was 18 years old when his parents settled on the farm. The undisputed record shows that appellee was trusted by his parents in the management of the farm over a period of some 33 years before his mother executed to him the deed in controversy. The deed contains no provision for the support of the grantor; but it is undisputed that appellee did support and properly care for his mother from the time he took charge of the farm until her death. The deed was made when the mother was 87 years of age. There is no serious challenge that, at the time she executed the deed, she was of sound mind and mentally competent. For about six years after attaining his majority, Sidney remained unmarried, and devoted to his mother. He was married in 1895. The record shows that his wife was kind and helpful in the care of the mother. The undisputed record is that Sidney paid the interest on the loans and the taxes during all those years, furnished support, clothing, and spending money for his mother, and improved the farm to the extent of approximately $20,000. The interest on the loans, taxes, and a reasonable amount for the support of the mother would aggregate approximately $14,000. The farm is now subject to a loan of

$13,500, drawing 6 per cent interest. Sidney testified, and it is not disputed, that his services were reasonably worth, for the six years after he became of age, $500 per annum, or a total of $3,000, and that, after that time, his services were reasonably worth $1,000 per year. Appellee has paid $3,000 into the estate.

The record disclosed that, in 1906, Mary J. Dunlap executed a will, witnessed by John M. Edwards and G. E. McMullen. The will devised to appellee all of her property, including the land in controversy herein, but provided that he should pay her estate at her death the sum of $3,000. This will was in existence up to the time she executed the deed in controversy, in 1916. The evidence of the notary, G. E. McMullen, who drew and took the acknowledgment of the deed, shows that the grantor, in substance, asked him whether the deed would take the place of the will, and stated that she intended it should do so. No will was found after the death of the mother. Presumably it was destroyed when the deed was executed. G. E. McMullen, who drew the deed in controversy, and took the acknowledgment of it, testified, in substance, that, at the time the deed was drawn, only Mrs. Dunlap and himself were present; that Roy (appellee) was about the house, but not in the immediate presence where the deed was drawn; that Mrs. Dunlap told him she wanted to make a deed of her land to Roy, and told him what to put in the deed; that, when he came to fill in the consideration, he asked her what it was to be, and she told him $3,000; that he suggested that it should be more, and she said that she thought it was all her son should be required to pay; that she said "this deed is practically made in fulfillment of that [the will], and that the will was to be destroyed;" that he had drawn the will mentioned, some ten years before; that "no one except Mrs. Dunlap directed me as to what to put in the deed;" that Roy asked him to come to the house, saying that his mother "wanted me to make some papers;" that he did not tell him what kind of papers she wanted drawn, and did not afterwards talk to him about the papers, or take any part when the deed was drawn; that the deed was placed of record immediately upon its execution; that Mrs. Dunlap was of sound mind when the deed was made.

The family of Mary J. Dunlap was long-lived. The evi-

dence of two of her sisters and one brother shows their ages
at the time of the trial to be 86, 80, and 77, respectively. At
the time of her death, Mary J. Dunlap was past 90 years of age.
There is nothing in the record to indicate any mental weakness
at any time during her long life. She read considerably, and
was interested in what was going on about her and in current
events transpiring, as she gleaned them from the newspapers.
She was interested in and kept in close communication with her
children and grandchildren. She carried on an active corre-
spondence with members of her family, to the very last of her
life. A number of these letters appear in the record. They dis-
close a clear mind. A letter written to her sister, Margaret
Brewster, bearing date July 23, 1919, when she was past 90
years of age, shows that she was thinking and writing clearly.
In the letter she discussed her health, the weather, the damage
to the crops by water, hail, and rust, the progress of the farm
work, and the poultry on her son's farm, etc. In this letter
she mentioned the birth of a grandchild, saying:

"I had a card from Nellie, saying that her youngest girl
had a baby girl, born on my birthday. She is my great-grand-
daughter. I am 90 years older than she is."

Mary Goodner, the eldest daughter, testified that she lived
near her mother in Shelby County for about 20 years; that
during that time she saw her mother at least once a week; that,
in the summer of 1916, her mother visited her in Fremont
County, and remained with her on the farm where she lived,
about seven weeks; that she visited her mother in the winter of
1917, and was with her about two weeks; that she visited her
mother in 1918, and remained with her about three weeks; that
she visited her mother several days in October, 1919; that, since
her removal from Shelby County, she had seen her mother every
year; that she received letters from her mother about once a
month; that, considering her age, her mother enjoyed good
health all the time; that she was quite strong most of the time;
that she suffered with appendicitis once, and some heart trouble,
which was the only illness that she knew her mother to have had
in late years; that her heart trouble came with old age, and
troubled her only at one time, when she was with her; that her
mother was an active woman, but took life easily during her

latter years; that her mother seemed to rely on Roy's judgment about matters, and had confidence in his management of her affairs; that she told her, substantially, that she relied on his advice, and had confidence in him; that, at the time she executed the deed in controversy, her mother was a person of sound mind; that:

"I think during all the time I have known her, she was a person of sound mind. I think she was of sound mind the last time I talked with her. I never heard her make any complaint about life or her outlook on life. She was of happy, cheerful disposition, and always seemed satisfied."

After a careful examination of the whole record, we fail to find support of appellants' contention that appellee in any degree unduly influenced his mother to execute the deed to him. While the close and confidential relations shown to exist between the mother and son might justify a presumption of undue influence and constructive fraud, such presumption is entirely overcome by the undisputed evidence and circumstances surrounding the whole transaction.

We reach the conclusion that the decree of the lower court was right, and it is affirmed.—*Affirmed*.

EVANS, PRESTON, and FAVILLE, JJ., concur.