CHARLES O'NEIL, Appellant, v. FANNIE O'NEIL MORRISON et al., Appellees.

No. 40297.

DECEMBER 9, 1930.

*Frank S. Lovrien* and *Thomas & Loth,* for appellant.

*D. M. Kelleher,* for appellees.

DE GRAFF, J.—Primarily, a fact issue is presented. The law of the case is well defined.

The one question involves the validity of a deed of conveyance of certain Humboldt County, Iowa, land by Michael O'Neil to his daughter, Fannie O'Neil Morrison, the defendant. The deed was executed on July 6, 1928, and filed for record on the following day. Michael O'Neil at that time was 85 years of age. He was born in Canada, and migrated to Wisconsin in early manhood. He thereafter moved to Iowa, and in 1873 was married, and established a home on the farm in question. In 1898, the family moved to Livermore, Iowa, where O'Neil purchased a residence in said town. Four children were born, two of whom died unmarried, many years ago. The other two, a

son and a daughter, are the parties to this action. The plaintiff, Charles, is 53 years old, unmarried, and has had little educational training. His sister Fannie is five years younger, and had the advantages of high school and college training. She was a teacher until her marriage to L. C. Morrison, in 1914. A niece, Mary Moncrief, lived with the O'Neils from the time she was two years old until she was married, in 1911. The father, Michael O'Neil, could not write, and could read but little. By reason of this fact, his checks, papers, and legal documents were signed by "his mark." In so signing his checks and papers, he directed his banker, his son Charles, his daughter Fannie, or his niece Mary Moncrief, respectively, to sign his name. Michael O'Neil was a devout Catholic. He was a man of positive views, intelligent as to affairs in general, and personally looked after his own business matters. In 1915, Fannie and her husband moved on the farm, as the father's tenants. During most of the time thereafter, Charles lived with his parents in town. The wife of Michael O'Neil died in 1925. It is apparent from the record that in 1926 some friction arose between the Morrisons and Michael O'Neil, while the former were tenants on the farm, and on August 1, 1927, Michael served a notice on the Morrisons to quit the farm. The controversy, however, was compromised and settled. There existed some feeling between Fannie and her brother Charles, and it was a mutual and rather vindictive feeling. Michael O'Neil was severely injured by a fall on May 5, 1928, and thereafter was under a doctor's care most of the time until his death, on October 25, 1928. At the time of his injury by the fall, he was taken from Livermore to Humboldt, and placed in the care of his daughter Fannie, where he remained until his death. The ill feeling that existed between Charles and Fannie is evidenced at the time of O'Neil's injury by the fact that, when Dr. Sproule asked Charles to assist him in helping to carry his father to the doctor's automobile, preparatory to taking him to Fannie's home in Humboldt, the son refused to lend assistance, and said, " if Mrs. Morrison was doing it, to let her go ahead and do it." Charles did not visit his father during the time he was in Fannie's home, and did not see his father again until the day of his father's funeral, although Charles testified: "I realized that my father was 85 years of age, and didn't have a great many years to live. I knew his health was breaking."

Charles admitted that Livermore is 12 miles from Humboldt, and that he "often drove it."

It is the contention of the plaintiff-appellant that the deed in question was procured (1) by fraud and undue influence, and (2) without consideration; (3) that, at the time the deed was procured, there existed a fiduciary relation between the father, Michael O'Neil, and the daughter, Fannie O'Neil Morrison; and (4) that, by reason of the father's age and physical and mental infirmities, he was incompetent to make the deed.

We first turn to the mental capacity of the grantor, Michael O'Neil, at the time the deed was executed. We have no hesitation, under the record before us, in holding that Michael O'Neil was mentally competent when he executed the deed. He knew what he was doing. The doctor who attended O'Neil from the time of his fall and resulting injury testified that O'Neil's mind was normal until his very last illness.

"It seemed to me that his mentality was holding up normally for a man of his age. He was interested in normal current things. I saw no evidence of delusions or dementia of any sort. I would say that he did not have dementia. I observed no letting down of personal pride or pride in his personal appearance that old people sometimes indicate who are afflicted with senile dementia."

The doctor expressed his opinion that O'Neil was capable of understanding the matters and things which would be involved in ordinary business transactions. The nurse in attendance testified as to her observations of O'Neil. During the last ten days of O'Neil's life, a trained nurse was in charge, and she testified that she observed no difference in his mental grasp, except when he was delirious at times. The nurse had known him for many years, and stated that his mind "was as clear as anybody's." We will not review the facts further in this particular, except to state the circumstances that accompanied the making of this deed.

Attorney C. W. Garfield, of Humboldt, Iowa, had acted as the legal advisor of Michael O'Neil for several years prior to the time in question. The appellee Fannie O'Neil Morrison testified that she did not telephone the Garfield law office. The office was notified, however, by someone that Michael O'Neil de-

sired to have Garfield come to Fannie's home, where O'Neil was then living. Attorney Garfield was on his vacation, and the stenographer in the office told Attorney Jaqua (who occupied the same office) of Michael's wish. Jaqua was a distant relative of O'Neil's, and respected the telephone call. Jaqua testified that, when he arrived at the Morrison home, ''Uncle Mike'' told him that he wanted to transfer all of his property to Fannie.

''Well, when I first went in, he told me he had called for Mr. Garfield, but he found he was on his vacation, and thought he would call me, and thought I could take care of what he wanted done. * * * I asked him if he wanted a deed of the land made, and he said 'yes,' that is what he wanted; he wanted to transfer all of the property to Fannie.''

It is quite apparent that O'Neil and Attorney Jaqua had an understanding as to what was to be done. Fannie was not present during the conversation. The deed was prepared and read to O'Neil. O'Neil then signed by mark, and Jaqua signed as a witness. Jaqua then suggested to O'Neil that there should be another witness, and a Mr. Sheldon was secured, and Sheldon then signed; whereupon Jaqua, as notary public, took the acknowledgment. There was no one in the room when O'Neil gave to Jaqua the directions as to what should be done,—that is, in transferring all his property to his daughter Fannie. After the deed had been prepared, read to O'Neil, signed, witnessed, and acknowledged, it was then turned over to the daughter, Fannie O'Neil Morrison, and this was done when Jaqua asked O'Neil what he wanted him to do with the deed. O'Neil said that he wanted it turned over to Fannie. On the next day, Fannie gave Jaqua the deed, to be placed on record; and the filing mark of the recorder's office shows that the deed was filed on July 7, 1928. The conversation between O'Neil and Jaqua at the time clearly shows that O'Neil knew and understood the situation. He talked intelligently. He even asked Jaqua if the latter ''could draw the papers for him.'' Jaqua testified that he observed no difference in O'Neil's expression, language, and method of expression on that date from what he had observed prior to that time, and Jaqua had personally known Michael O'Neil for many years. Sheldon, who witnessed the deed, was the town marshal of Humboldt, and superintendent of the

waterworks. He was a man 65 years of age, but he had not been previously acquainted with O'Neil. At the time of the introduction of Sheldon to O'Neil by Jaqua, O'Neil told Sheldon that "he [O'Neil] knew me, but he knew my father better." Sheldon further testified that O'Neil seemed bright, and could talk, and appeared to know what he was doing. In this connection it may be stated that Attorney C. W. Garfield, who was usually consulted by O'Neil in business matters, upon his return from his vacation, called on O'Neil at the Morrison home. Among the first questions that O'Neil asked Garfield was: "Has Franklin [meaning Jaqua] told you what I did while you were gone?" Upon an affirmative reply by Garfield, O'Neil said: "Do you think he has got those papers drawn all right, so they will hold?" To this question Garfield replied: "I haven't seen them, but I think he would know enough to draw them." The next question asked by O'Neil was: "Do you think I have done right?" To which Garfield replied: "That is a hard question, Mr. O'Neil,—that is for you to say; the property is yours. Did you do what you wanted to do?" O'Neil's answer is significant: "Yes, I have." Thereupon, Garfield told him: "If you have done what you wanted to do, and if you are satisfied with it, it is not my place to say whether you have done right or not." Attorney Garfield was asked, as a witness, whether, in his talks with O'Neil on three occasions after the execution of the deed, O'Neil talked intelligently, and whether he appeared to comprehend his property and business affairs. To this question Garfield replied: "He did."

At this point it may be said that, subsequent to the execution of the deed in question, O'Neil did have prepared by Garfield, on July 11, 1928, an assignment and bill of sale of his personalty and choses in action to his daughter Fannie, and on August 2d, he joined in the assignment of the 1929 lease of the farm to Fannie, and on August 8th, transferred his bank account to Fannie,—or, more strictly. speaking, created a joint bank account to himself and Fannie.

The record evidence is sufficient to indicate that Mr. O'Neil had mental capacity and comprehended what he did do. The burden of proof rested upon the plaintiff, Charles O'Neil, to

establish the mental incapacity of the grantor. *Sutherland State Bank v. Furgason,* 192 Iowa 1295. Whether the deed was inequitable, as between the grantor and his children, is not a material subject of inquiry here. The question is whether or not the deed evidenced the purpose and will of Michael O'Neil. This court has no power to apportion the property upon any basis. We must either sustain the deed or nullify it. *Thompson v. Mott,* 202 Iowa 246. The instant deed is absolute in form, and was fully delivered by the grantor during his life. There is no recital in the deed that the conveyance was conditional. The title passed at once. No one may question the right of Michael O'Neil to do what he did do, if he had the mental capacity, and was not under any undue influence at the time. As said in *Reeves v. Howard,* 118 Iowa 121:

"It is equally certain that such right may be exercised with like effect up to the last hour of the grantor's life, even though in so doing he disregards ties of blood and affinity which others might regard as binding moral obligations. This rule is subject, of course, to the condition that, in making such disposition of his property, he is of sound mind, and acts of his own free will and accord; and such seems to be the fact in this case."

See, also, *Coughlin v. St. Patrick's Church,* 201 Iowa 1268, l. c. 1278. It is earnestly urged by the able counsel for the appellant that the acts of O'Neil as to his testamentary disposition of his property prior to the time of the execution of the deed, show that he had always intended to treat his son and his daughter with substantial and studied equality, and that O'Neil in his prior wills had shown a great and growing anxiety to provide for masses for the repose of his soul. Counsel for appellant contend that his last act, to wit, the execution of the deed, was not consonant with his intentions, as evidenced by his wills theretofore made. Counsel intimate that O'Neil's act and conduct in the instant matter are inexplicable. We are not, however, dealing with a mystery. Human conduct is not always explainable. The fact that we might expect a father and a devout Catholic to do otherwise is not a basis *per se* for disturbing an instrument executed with all the solemnity which the law requires.

The trial court concluded that the change of attitude of Michael O'Neil towards his son Charles may be attributed to Charles's own conduct toward his father, to which reference has heretofore been made. Whatever may have been the reason or motive of O'Neil in abrogating the wills and executing the deed is not vital here, unless the last act may be impeached by reason of his mental incompetency or undue influence, through which his volition was surrendered to a dominant mind,—to wit, his daughter, the defendant herein.

Before answering the foregoing question, we inquire whether a fiduciary relationship existed between O'Neil and his daughter Fannie when the instant deed was executed. This is an important question, for the reason that it determines whether the burden of proof shall be placed on the plaintiff or on the defendant. Before the doctrine of fiduciary relationship can be applied, the existence of a confidential relationship or of facts giving rise to it must be proved. It is said in *Utterback v. Hollingsworth,* 208 Iowa 300:

"The relationship must be such as to enable the one charged with having abused it to have exercised it to his advantage. It must appear expressly or by implication that trust or confidence was reposed. The supposed trustee must be shown to have been in a position of advantage or superiority such as to imply a dominating influence over the *cestui.*" (Citing cases.)

In the instant case, there is no evidence that O'Neil was not transacting his own business, and there is no evidence that Fannie O'Neil Morrison transacted his business as his agent or representative. By reason of the fact that O'Neil could not write his checks, as pointed out heretofore, they were written, at his direction, by different persons. The son Charles wrote some, and the daughter Fannie wrote quite a number, but this circumstance did not create a confidential or fiduciary relationship. It is shown that O'Neil, during his sickness at Fannie's home, acted as a very sensible, kindly old gentleman. The relation between the father and the daughter Fannie was very cordial, and by reason of his situation and physical condition while in her home for the few months prior to his death, O'Neil "took kindly to whatever she asked and suggested, and he was a docile and

agreeable patient, and it did not make a bit of difference who gave the directions, whether the daughter, the doctor, or the nurse.'' This court cannot predicate a fiduciary relationship on the record facts disclosed. There is no proof of domination which would place the burden of negativing undue influence upon the defendant daughter. The mere fact of residence in the home of Fannie is not a basis for a claim of fiduciary relationship. It is a well recognized rule in this state that the relationship between the grantor and the grantee may be so intimate, confidential, and fiduciary that the burden of proof may properly be placed on the grantee to show the *bona fides* of a transaction of this character. *Osborn v. Fry*, 202 Iowa 129. In the *Osborn* case, supra, it is said that it is difficult to lay down a hard and fast rule in such cases, except the general rule that the circumstances of any particular case may show such a confidential relation that the burden to establish the *bona fides* of a conveyance that is attacked, should rest upon the grantee. The facts in *Curtis v. Armagast*, 158 Iowa 507, are quite different from the facts in the case at bar. In the *Curtis* case, supra, the grantee was not merely and only the son of the grantor, but he was her agent, and for nearly 20 years had been intrusted by her with the management of the lands comprising practically all of her worldly estate. Even that case must be viewed as a borderline decision. It was not unanimously adopted by the court.

In the light of all the circumstances disclosed by this record, there was no fiduciary relationship existing between the grantor and the grantee; and as to undue influence charged against the  grantee by the plaintiff, he has failed to meet the burden imposed upon him. The fact of blood relationship between father and daughter will not *per se* raise a presumption of undue influence. There must be facts *aliunde*, in order to sustain the allegation of undue influence. *Albaugh v. Shrope*, 197 Iowa 844. The general rule is that the burden of proof, generally speaking, is upon the alleging party to establish undue influence. *Steen v. Steen*, 169 Iowa 264; *Reed v. Dunlap*, 199 Iowa 18. Even if O'Neil's judgment or prejudices led him astray, this court will not impeach his act, so long as he retained mind enough to know the nature and effect of the disposition he made of his estate, whether by will or by deed of conveyance.

*Nowlen v. Nowlen,* 122 Iowa 541. Courts of last resort in our sister jurisdictions recognize the rule which this court has declared in the cases cited herein. See *Justice v. Justice's Ex'rs.* (N. J. Ch.), 18 Atl. 674; *Kennedy v. McCann,* 101 Md. 643 (61 Atl. 625).

The defendant Fannie was permitted, over objection based on the so-called "dead man's statute" (Section 11257, Code, 1927), to testify that she did not, at any time in her life, ask her father to give or transfer anything to her. Her  answer to the question was one word, "No." This point or proposition was not argued by the plaintiff-appellant in his original argument filed in this cause, but it finds place in his reply argument only. Waiving this procedural matter, and disregarding the aforesaid negative answer, we find it sufficient to state that this cause is triable *de novo* here, and the evidence is clear, satisfactory, and convincing that there was no fraud used by the defendant Fannie upon her father, Michael O'Neil, and that no fiduciary relationship existed between the father and the daughter at the time the deed in question was executed and delivered. Further comment in this particular is unnecessary.

The appellant argues that the deed is without consideration. The deed recited a consideration of "one ($1.00) dollar, love and affection, and other valuable consideration in hand paid by  Fannie Morrison of Humboldt County and state of Iowa." When Attorney Jaqua drew this deed, at the behest of Michael O'Neil, he was acting as attorney and scrivener for O'Neil. The record discloses a check dated July 24, 1928, payable to Jaqua, in the sum of $11.70. This check was signed "M. O'Neil, Fannie Morrison." The record shows a number of checks from May 15 to October 29, 1928, signed in this manner, including the payment of O'Neil's taxes, in September, 1928; but the evidence also shows that these checks were written at the direction and request of O'Neil. The recited consideration in the deed has not been impeached. It must be conceded that the father, Michael O'Neil, had the right to dispose of his property as he saw fit, so long as he was mentally competent, and under no undue influence. In brief, the plaintiff had no stand-

426

ing to attack the conveyance for want of sufficient consideration. 18 Corpus Juris 864.

The decree entered by the trial court is—*Affirmed.*

MORLING, C. J., and STEVENS, ALBERT, and WAGNER, JJ., concur.