LORENA FLINT, Appellee, v. C. M. VARNEY, Executor, Appellant; FARMERS TRUST & SAVINGS BANK of Spencer, Appellee.

No. 42965.

DECEMBER 17, 1935.

H. E. Narey, for appellant.

Buck & Kirkpatrick, for appellees.

ALBERT, J.—Katie Varney, a woman between sixty and seventy years of age, the wife of C. M. Varney, the executor herein, sustained a fractured hip on the 23d day of July 1930, and was taken to the hospital at Spencer, Iowa, where she died on the 5th day of August of the same year from clinical pneumonia.

The plaintiff herein, Lorena Flint, is a niece of C. M. Varney. The deceased owned a purse, which contained a check of C. M. Varney, payable to Katie Varney, for $10, drawn on the Farmers Trust & Savings Bank of Spencer, and also a certificate of deposit in the same bank for $350, a watch, and $10 in money. This is the property involved herein.

The plaintiff claims that she is entitled to the same as a gift from the deceased *donatio causa mortis*. Defendant executor claims said property is part of the assets of the estate of said deceased. The purse and its contents were in the possession of the plaintiff at the time of the death of Katie Varney.

 The doctrine of *donatio causa mortis* has been repeatedly recognized by this court, and the subject is quite fully reviewed in Vosburg v. Mallory, 155 Iowa 165, 135 N. W. 577, 578, Ann. Cas. 1914C, 880. There are certain rules governing this matter which must have attention in the determination of this case. In the aforesaid case we said:

"A gift *causa mortis* is defined to be a gift of personal property made by a person in expectation of death then imminent upon an essential condition that the property shall belong fully to the donee in case the donor dies as anticipated leaving the donee surviving him, and the gift is not in the meantime revoked. 2 Schouler on Personal property, section 135. 'Story observes that by our law there can be no valid *donatio causa mortis* (1) unless the gift be with a view to the donor's death; (2) unless it be conditioned to take effect only on the donor's death by his existing disorder or in his existing illness; and (3) unless there be an actual delivery of the subject of the donation.' "

The literal translation of the term *"donatio causa mortis"* is "a gift in prospect of death." This species of donation came down to us from the civil lawyers, who borrowed it from the Greeks, and it became a part of the common law. No writing or consideration is a necessary element of such a gift. The essential elements, as set out in 28 C. J. p. 687, section 97, are: (1) That the gift must be in view of the donor's impending death; (2) the donor must die of the disorder or peril; (3) there must be a delivery of the thing given; (4) the donor must be competent to make the gift; (5) there must be an intent on his part to do so; and (6) there must be an acceptance by the donee.

There must be an apprehension of death from some existing disease or impending peril. This apprehension may arise from illness or from a threat of peril or danger. It is not necessary, however, that the gift be made while the donor is *in extremis* or moved by apprehension of immediate death when there is no time or opportunity to make a will, or that he be confined to his bed or his room. Williams v. Guile, 117 N. Y. 343, 22 N. E. 1071, 6 L. R. A. 366; 28 C. J. p. 688. Technically, there must be an acceptance by the donee as well as delivery by the donor, but this matter is of slight practical importance; where the gift has been received by the donee and imposes no burden on him acceptance will be presumed. In re Estate of Podhajsky, 137 Iowa 742, 115 N. W. 590; Darland v. Taylor, 52 Iowa 503, 3 N. W. 510, 35 Am. Rep. 285; In re Bell's Estate, 150 Iowa 725, 130 N. W. 798; Kneeland v. Cowperthwaite, 138 Iowa 193, 115 P. 1026; Lewis v. Curnutt, 130 Iowa 423, 106 N. W. 914. It seems to be quite well settled that, where the gift consists of certificates of deposit or checks on banks, payable to the order of the donor, the gift is good without indorsement of these instruments. Mellor v. Willows Bank, 173 Cal. 454, 160 P. 567; Fagan v. Troutman, 24 Colo. App. 473, 135 P. 122; Philpot v. Temple Banking Co., 3 Ga. App. 742, 60 S. E. 480; Callahan v. Forest (Sup.) 118 N. Y. S. 541; Foster v. Murphy, 76 Neb. 576, 107 N. W. 843; Deneff v. Helms, 42 Or. 161, 70 P. 390; Royston v. McCulley (Tenn.) 59 S. W. 725, 52 L. R. A. 899; Basket v. Hassell, 107 U. S. 602, 2 S. Ct. 415, 27 L. Ed. 500.

Mrs. Lorena Flint was a witness in the case. Objection is made to her competency under section 11257 of the Code. We have announced the rule that in equity cases, triable *de novo* in this court, any evidence introduced in the case from an incompetent witness under said section 11257 will be disregarded by this court in reaching its conclusion. O'Neil v. Morrison, 211 Iowa 416, 233 N. W. 708; Nortman v. Lally, 204 Iowa, 638, 215 N. W. 713.

Defendant by way of answer pleaded a general denial, and also that Katie Varney at the time of the alleged transaction was physically ill and mentally incompetent, and was unable at said time to know or comprehend the nature and extent of her property, etc., and that she was mentally incompetent to make gifts; also, that the alleged gift was the result of persuasion and

undue influence on the part of the plaintiff exercised on Katie Varney at the time in question.

The record in the case is wholly silent as to any evidence of the incompetency of the donor or that there was undue influence. All the evidence there is in the record affirmatively shows that the donor was mentally competent at the time the alleged transaction occurred. So we will give no further attention to this contention.

In the further consideration of this case we will recognize and deal only with the testimony given by this witness which she was competent to give. Her testimony, summarized, is that she knew Katie Varney prior to her marriage, and that they visited back and forth. She went to the hospital on the 23d day of July, where Mrs. Varney was, and visited at the hospital every day except one during Mrs. Varney's illness. Referring to the handbag, she says: "I have seen that handbag before. It was Mrs. Varney's handbag. I saw the handbag in the drawer in the dresser in the room in which Mrs. Varney was. I took the handbag to my home with me. This was the first week that Mrs. Varney was in the hospital. I don't remember the date. There was in the handbag a certificate of deposit, a check, Mrs. Varney's watch, and $10 in money. (These were identified as exhibits in the case.) After Mrs. Varney's death I cashed the $10 check, thinking it was my own. On the morning of Mrs. Varney's death Mr. Varney went with me to my home. I told him my aunt had given me the bag and the circumstances under which it was given and that she wished me to have it in case of her death. He told me I might keep it. I described everything that was in the handbag to him. It was then in my possession with its contents. I would remain a few minutes when I visited the hospital, perhaps a half hour. Sometimes I was there twice a day, just to call on her. Prior to Mrs. Varney's coming to the hospital I would see her in Dickens possibly once every two weeks, whenever I happened to go to Dickens. I never saw her delirious at the hospital. It was only two or three days before she passed away that I had to rouse her. There was nothing wrong with her except a fractured hip, so far as I observed. Her pain was located in her hip and leg. I don't know what she died of. I didn't know she was going to die until the morning of her death. Her death was unexpected and a surprise to me. Mr. Varney and I used to get along all right,

There was a little misunderstanding in the last few years perhaps. After that time there was not a friendly feeling between us, but I went to his home just the same.''

Merry Miller testifies that she was superintendent of the Spencer Hospital for seven years. She was graduated as a nurse in 1920. She personally knew Mrs. Varney and Mrs. Flint, although, ''My acquaintance with Katie Varney was casual. I recall the circumstance of Katie Varney being in the hospital up to the time of her death. I think I saw Mrs. Flint two or three times in Mrs. Varney's room, in the hospital. I was in her room a few days before her death when Mrs. Flint was there. Mrs. Flint asked me to go in. She said Mrs. Varney wanted to say something to me. I went in. Mrs. Flint asked Mrs. Varney to tell me what she said to her (Mrs. Flint) before. Mrs. Varney said she had wished Mrs. Flint to have a purse and its contents in case anything happened to her (Mrs. Varney). That is the conversation as nearly as I can remember it. I suppose those were not the exact words, but that was the substance as I remember it. I do not recall that I did take part in the conversation. I believe Mrs. Varney did comprehend what she was talking about. At the time Mrs. Varney made this statement I think she was sound mentally and knew and understood what she was saying and doing. When I went in to Mrs. Varney's room I presume I would talk to Mrs. Varney and engage in conversation with her. I don't remember what the conversation was.'' This witness had previously testified that she was the overseer of the nurses but sometimes assisted them with the work. ''I am not sure how often I would be in Mrs. Varney's room. I don't remember giving her any attention as a nurse. From observation alone at the times I was in Mrs. Varney's room and up to and including the day when I was there with Mrs. Flint I believe Mrs. Varney was of sound mind.''

Ada Smith testifies that she has known Mrs. Varney since she was a little girl. ''The family visited back and forth. I remember when Mrs. Varney was brought to the hospital in Spencer, I visited her every day the first week from ten minutes to half an hour. She was in a coma state from Sunday afternoon at five o'clock and died the following Tuesday. I did not realize that she was going to die or was in serious condition until Sunday evening before her death when I called at the hospital. I saw her every day the first week and about every other

day the second week, up until Thursday or Friday before her death. I did not notice any difference in her mental condition. In my opinion she was of sound mind.''

The testimony of Mrs. Mary Melissa Goff was taken in the form of a deposition. ''I have lived in Dickens since 1914. Knew Katie Varney very intimately; belonged to the same church; visited back and forth two or three times a week. I recall she was injured and taken to the hospital at Spencer. She was there three or four weeks. It might have been less, but she did not expect to die, and I only called upon her once at the hospital about a week before her death. She was in bed and not very well and I did not stay long. I expected to come back to the hospital to see her again the next morning and she asked me to call at her house and get her handbag that was in her bedroom, and enumerated the things in the handbag, and she said she wanted Lorena Flint to have the contents. She said, 'My watch, my purse, my glasses, and some papers, and I want Lorena to have them.' She said Lorena had been very nice and kind to her, and she needed it, and 'I want her to have it because she has been kind to me.' I did not go but I told Mr. Varney that; I said, 'You go up and get that handbag when you go as I am not going this morning.' Mrs. Varney said, 'I want you to hand everything there is in that handbag to Lorena.' I don't know whether Mr. Varney took that or not.'' On cross-examination the witness said: ''I did not consider that her illness was so serious as to result in death. Mrs. Varney told me that Mrs. Flint had been to see her every day. I don't remember how long Mrs. Varney was in the hospital. I should think I was at the hospital a week or two before Mrs. Varney died. My memory with reference to it is not clear. I don't remember anything else we talked about. Mrs. Flint was there all the time I was.''

 It is to be remembered that the burden of proof in this case is on the plaintiff to establish this gift *causa mortis*. The fact that at the time of the death of the deceased the plaintiff was in possession of this personal property does not raise a presumption of a gift. See Roberts v. Morse, 190 Iowa 1344, at page 1349, 181 N. W. 678. In discussing this question as applying to the facts in this case, the undisputed evidence is that the deceased was in her lifetime the owner of the property in question, and continued to be the owner thereof until her death un-

less such ownership had been divested by a gift thereof. Plaintiff claims that she acquired the ownership of this property by gift, and the burden is on her to prove it. Kirchner v. Lenz, 114 Iowa 527, 87 N. W. 497; Samson v. Samson, 67 Iowa 253, 25 N. W. 233. Unless the fact of the gift was proven, then the conceded ownership of the decedent during life presumptively continued to the time of her death, and the possession of the plaintiff, if such, would become presumptively that of a bailee. Roberts v. Morse, 190 Iowa 1344, 181 N. W. 678.

■■■ That delivery may be proven by circumstantial evidence, see Chicago Savings Bank & Trust Co. v. Cohn, 197 Ill. App. 326; 28 C. J. p. 705; 12 R. C. L. p. 970. Prior declarations of the donor constitute part of the *res gestæ*. Dawson v. Waggaman, 23 App. D. C. 428; Parker v. Marston, 27 Me. 196; Matter of Swade, 65 App. Div. 592, 72 N. Y. S. 1030; 12 R. C. L. p. 971. Subsequent declarations of the donor in the nature of an admission against interest are admissible in evidence as tending to show that he gave the property in question to the donee. 28 C. J. p. 704. In the case of Darland v. Taylor, 52 Iowa 503, at page 506, 3 N. W. 510, 35 Am. Rep. 285, we recognized this rule and held that the declarations of the donor are admissible from which a delivery may be inferred.

In the light of the rules of law that are laid down in this opinion, and the record in this case, the substance of which we have set out, we are of the opinion that the plaintiff was entitled to recover herein, and that the district court made no error in its ruling when it entered a decree in her favor.—Affirmed.

All Justices concur.